[No. AO21229. First Dist., Div. Five. May 10, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
ED JONES, Defendant and Appellant.

654

COUNSEL

James J. Haight, under appointment by the Court of Appeal, and Haight &
Lieberman for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Thomas A. Brady and Mark S.
Howell, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

HANING, J.—After trial by jury, defendant Ed Jones was convicted of one
count of murder in the second degree. (Pen. Code, § 187.) On appeal,
defendant asserts the trial court committed reversible error in allowing tes-
timony concerning a statement made by the victim, John McKinney, Jr., to
an attending physician. Defendant contends the victim's statement consti-
tuted inadmissible hearsay and that testimony at trial concerning that state-
ment violated his rights under the confrontation clauses of both the Sixth
Amendment of the United States Constitution and article I, section 15, of
the California Constitution. We disagree and affirm the conviction.

The charge stems from a fire at a house in Seaside on March 9, 1982.
McKinney received extensive burns in the fire. He died as a result of the
burns one month later.

At the time of the fire, both defendant and McKinney lived at the house.
Darryl Wardell, whose testimony provided much of the incriminating evi-
dence, had also been living at the house, but was in the final stages of
moving out when the fire occurred. McKinney came to live at the house
approximately one week before the fire. He was described as a slouched-

over "little old meek sort of old man." His nickname was "Dadblasted" because of his frequent use of the term. Wardell described him as a "wino" who only drank and slept all day. According to defendant, McKinney would typically buy wine until he could not walk up the hill to the corner store for more.

On March 9, 1982, at 10:49 p.m., the Seaside Fire Department received an alarm reporting a fire at the house. Firefighters arrived on the scene within 10 minutes of the alarm and discovered a fire in the northwest bedroom. No one was in the house. The northwest bedroom was "fully involved" in the fire, and flames were beginning to spread out the window and into the hall. Firefighters attacked the fire from both inside and outside the house. Myron Wyckoff, the first firefighter to enter the house, accidentally knocked over a can with his foot as he was crawling down the hallway toward the fire. He did not stop to examine the can. The crew managed to extinguish the fire in five to ten minutes.

Defendant and Wardell spent much of March 9, 1982, drinking at the Ebony Lounge, a local bar. They arrived together at the house at approximately 10 p.m. McKinney was in the living room. He and defendant were soon embroiled in an argument. After several minutes of arguing, McKinney lay down on the couch in the living room. According to Wardell, defendant then went outside and came back in with a gas can and began pouring gasoline over McKinney. Wardell took the can from defendant and put it outside. There was still liquid in the can. Hoping to resolve the conflict, Wardell told McKinney to go to his room. McKinney did so. Defendant sat down in a chair in the living room; Wardell left the house "[b]ecause it was sickening." Wardell drove around the corner, thought better of leaving the two alone together, and drove back to the house. From the car he saw flames through the living room window. He parked the car and ran into the house. Entering the front door, he saw defendant standing in front of his bedroom door holding a gas can. McKinney was lying on the floor of his room, on fire. Wardell rolled him up in a rug or a blanket, putting out the fire, and carried him out to his car. McKinney was able to stand up by the car; he was "still talking." Defendant approached Wardell, saying, "You got to do me a solid. You got to do me a solid." Wardell replied, "Man, what are you talking about?" and defendant responded, "Tell them he was smoking in bed." McKinney had not been smoking in bed.

Wardell tried to back his car over defendant, and then drove to the fire department where he got no response, so he drove on to the hospital. During the drive, McKinney was talking to Wardell; he kept saying, "[t]ake me to the doctor," and "[m]an, it burns."

Wardell drove straight to the emergency room of the hospital. A nurse came out to the car with a wheelchair for McKinney, but McKinney walked into the hospital on his own. Wardell estimated that about 30 minutes elapsed between the time that he found McKinney on fire and the time McKinney entered the hospital.

At the emergency room, Wardell was allowed into the treatment room to talk briefly to McKinney. McKinney was on a table on his back, and his clothes had been removed. McKinney asked Wardell to tell his mother what had happened. Wardell left the hospital and went to McKinney's sister's house to tell her instead because he did not wish to be the bearer of bad news to the mother.

Saul Kunitz, M.D., was director of the emergency room at Monterey Hospital and had extensive experience treating burn patients and other emergencies. He was McKinney's first treating physician. Before allowing Kunitz to testify, the trial court held a hearing outside the presence of the jury to determine the admissibility of statements made by McKinney while he was being treated. Kunitz testified that McKinney walked into the emergency room on his own, and "looked very calm for the degree of injury that he had sustained." He also "appeared to be dazed." Kunitz began treatment "within seconds." He first administered morphine sulfate. McKinney had suffered third degree burns over much of his body. McKinney appeared to be in pain, but not commensurate with the magnitude of his injuries. "This gentleman was severely injured and yet he was not yelling or screaming in pain. He was not writhing on the bed. He appeared quite calm." In Kunitz' opinion, "the psychological shock of the trauma permitted him to not realize his degree of injury." Within five or ten minutes of the onset of treatment, Kunitz asked McKinney what had happened. McKinney answered, "The crazy nigger that I live with threw gasoline on me." Kunitz did not remember any lapse of time between the question and the answer. Kunitz repeated the question and McKinney gave the same answer. The court found McKinney's statement qualified as a spontaneous declaration under California Evidence Code section 1240.[1]

Kunitz then testified before the jury. He related McKinney's statement. He described McKinney's burns: third degree burns covering the anterior abdomen from the groin up to the nipples, the lower back, 50 to 70 percent of the left arm, 90 percent of the left leg, 40 to 50 percent of the right arm, and the entire right foot and ankle. The inside aspect of the right thigh had spotty second degree splash burns. The doctor's opinion was that the burns had been caused by a flammable liquid.

---

[1]All further statutory references are to the Evidence Code.

McKinney died on April 8, 1982, at San Francisco's St. Francis Memorial Hospital's burn center. The autopsy revealed that the burns were the proximate cause of death. The coroner testified that the burns appeared to have been caused by a flammable liquid. The burn on McKinney's torso flowed around his sides, meeting in the small of the back. This flowing pattern indicated that, when burned, McKinney was in a reclining position, lying on something firm, such as a floor. There were no burns on his hands.

Chromatographic tests were performed on the liquid contents of the gas can found in the house, on McKinney's clothing, on a sample of McKinney's mattress, and on a sample of the living room carpet where the gas can was found. The tests revealed the presence of gasoline mixed with some other substance in the gas can contents, the clothing, and the carpet. The mixture was the same in these three items. It was analyzed as being 70 to 90 percent gasoline.

Fingerprint analysis of the gas can revealed prints of Wardell and the landlord only. Flow patterns on the floor of the burned-out bedroom indicated an accelerant had been present on the floor when the fire started. Some areas of the floor had been protected for some time during the fire and later burned over. One such spot was consistent with the shape of a person's arm and head.

Defendant testified the fire started accidentally while he was painting in the bathroom; he had opened a can of paint thinner and put it near the door in McKinney's bedroom. He heard a noise and then saw McKinney standing near his bed on fire.

Shortly after the fire, defendant talked with Captain Pehrson, who was on the scene. Defendant said that he had been burned and showed Pehrson some burns on his hand and back. He told Pehrson he had been mixing paint and paint thinner in the bedroom, and an explosion occurred when he lit a cigarette. A witness who was driving by the house at the time of the fire testified defendant "said something about he was painting and he lit a match." A neighbor testified defendant "said something to me about a cigarette, lighting a cigarette and it blew up."

After the fire was extinguished, defendant disappeared from the Seaside area. He was arrested in San Francisco on June 25, 1982.

On appeal, defendant contends Kunitz should not have been permitted to repeat McKinney's statement, "The crazy nigger I live with threw gasoline on me." In allowing the statement the trial court declared: "There appears to me to be sufficient evidence to indicate that, one, it was a description of

an act or event that occurred to him as opposed to what other people said to him; and, two, that it was made sufficiently close in time. It was made after severe burns. [¶] There is a potential for the shock which was alleviating some of the pain and the answers that were given, although to questions, were spontaneous and not thought out. So that statement will be admissible."

, Defendant claims the statement does not qualify for admissibility under the spontaneous statement exception because (1) there was insufficient proof that McKinney had personal knowledge of the event described and (2) his statement was not sufficiently spontaneous. Section 1240 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." As explained in *Showalter* v. *Western Pacific R. R. Co.* (1940) 16 Cal.2d 460 [106 P.2d 895], this statute is a codification of the res gestae exception to the hearsay rule. Such a statement is considered to be inherently trustworthy under the rationale that certain events are so startling they produce a suspension of an observer's powers of reflection. Therefore, a statement made spontaneously by that observer, while still under the stress of excitement and before there has been an opportunity to reflect or deliberate, will be an accurate and uncontrived description of the event observed. (See generally, *Showalter, supra*; 1 Jefferson, Evidence Benchbook (2d ed. 1982) § 13.1, pp. 369-378.)

 The determination that the required facts exist to permit admission of a spontaneous declaration as a hearsay exception is vested in the trial court. Its ruling should not be disturbed unless those facts are not supported by a preponderance of the evidence. (*People* v. *Tewksbury* (1976) 15 Cal.3d 953, 966, fn. 13 [127 Cal.Rptr. 135, 544 P.2d 1335]; *Showalter* v. *Western Pacific R. R. Co., supra,* 16 Cal.2d at pp. 468-469; *People* v. *Williams* (1980) 102 Cal.App.3d 1018, 1033 [162 Cal.Rptr. 748]; *Box* v. *California Date Growers Assn.* (1976) 57 Cal.App.3d 266, 273 [129 Cal.Rptr. 146].) In determining the existence of the preliminary facts some discretion is necessarily vested in the trial judge.

A. *Personal Knowledge.*

 The language of section 1240 indicates the declarant must have *perceived* the event to which his statement relates. Defendant argues that because McKinney did not receive any burns on his hands, he must not have been conscious of what was happening to him. Had he actually seen defendant pour gasoline on him, he would have attempted to deflect the flow

of gasoline or would have tried to remove his clothing, thereby getting gasoline on his hands, which would then have been burned. Because he lacked consciousness of defendant's action, he lacked the statutorily required perception of the event described in his statement.

Defendant cites *Ungefug* v. *D'Ambrosia* (1967) 250 Cal.App.2d 61 [58 Cal.Rptr. 223], where the court found insufficient evidence to establish that the declarant had seen the exciting event to which his declaration related. The court required a "persuasive inference" that the declarant actually witnessed the event; "the fact that the declarant was a percipient witness should not be purely a matter of speculation or conjecture. [Citations.]" (*Id.,* at p. 68.)

■ Jefferson writes that a declarant's spontaneous statement describing an exciting event is sufficient, *by itself,* to prove that the declarant observed such event. (1 Jefferson, Evidence Benchbook, *supra,* at p. 373, citing *People* v. *Worthington* (1974) 38 Cal.App.3d 359 [113 Cal.Rptr. 322].)

■ McKinney's statement indicates by itself that he observed the exciting event. Assuming as we must that the trial court accepted Wardell's version of the events, there was direct evidence that McKinney was alert and percipient when defendant first poured gasoline on him as he was lying on the living room couch. If in fact defendant poured gas on McKinney a second time, when Wardell was out of the house, it is difficult to imagine that McKinney would not have been aware of what was happening to him. From the sequence and nature of the events and from the statement itself, we conclude the trial court was correct in inferring that McKinney possessed the requisite personal knowledge.

B. *Spontaneity.*

■ For a statement to be admissible under section 1240, it must have been made before the declarant had an opportunity to reflect or fabricate. In making this difficult determination, the court must consider all of the surrounding circumstances. The lapse of time between the event and the statement is only one factor among many, and widely varying quantities of time lapse have been permitted. (*People* v. *Washington* (1969) 71 Cal.2d 1170, 1176 [81 Cal.Rptr. 5, 459 P.2d 259, 39 A.L.R.3d 541] [statement made over an hour after beating but within 3 minutes of regaining consciousness]; *People* v. *Francis* (1982) 129 Cal.App.3d 241, 254 [180 Cal.Rptr. 873] [statement made within 20 minutes of the stabbing under circumstances indicating emotional and physical stress and shock]; *People* v. *Bernalley* (1960) 185 Cal.App.2d 326 [8 Cal.Rptr. 375] [statement made 30 minutes after declarant's eyes were cut].) "To argue from one case to

another on this question of 'time to devise or contrive' is to trifle with principle and to cumber the records with unnecessary and unprofitable quibbles. There is a lamentable waste of time by Supreme Courts in here attempting either to create or to respect precedents. Instead of struggling weakly for the impossible, they should decisively insist that every case be treated upon its own circumstances. They should, if they are able, lift themselves sensibly to the even greater length of leaving the application of the principle absolutely to the *determination of the trial court.*" (6 Wigmore, Evidence (Chadbourn rev. ed. 1976) § 1750, p. 221, italics in original.)

■ McKinney's statement was made 30 to 40 minutes after his injury. Although he was in pain, it appeared that his pain was not commensurate with his injuries. He appeared calm, but "dazed." ■ Calmness, however, does not necessarily defeat admissibility of a spontaneous statement. (*People* v. *Francis, supra,* 129 Cal.App.3d at p. 254.) ■ McKinney had been given morphine sulfate, a painkiller. ■ The fact that sedatives were administered may contribute to a finding that a statement was not spontaneous, but is not controlling. (*Wiley* v. *Easter* (1962) 203 Cal.App.2d 845 [21 Cal.Rptr. 905].) ■ McKinney's statement was made in response to the question, "What happened?" Such a vague, brief question will not deprive the statement of spontaneity. (*People* v. *Washington, supra,* 71 Cal.2d at p. 1176.) The treating physician also testified that the psychological shock from the injury affected McKinney's response to the severity of his injuries.

Given these circumstances, we cannot say the trial court erred in allowing the testimony concerning this statement.

■ Despite the fact we find no error in the trial court's admission of McKinney's hearsay statement, we must still consider the defendant's claim that this evidence violated his right to confrontation under the Sixth Amendment of the United States Constitution, made applicable to the states through the Fourteenth Amendment (*Pointer* v. *Texas* (1965) 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065]) and article I, section 15 of the California Constitution.

■ Neither the federal confrontation clause, nor California's, imposes an absolute prohibition of the use of all hearsay. (*Pointer* v. *Texas, supra,* 380 U.S. at p. 407 [13 L.Ed.2d at p. 928]; *People* v. *Stritzinger* (1983) 34 Cal.3d 505, 515 [194 Cal.Rptr. 431, 668 P.2d 738].) ■ The United States Supreme Court has refrained from making sweeping declarations which would determine the validity under the confrontation clause of all exceptions to the hearsay rule. (*California* v. *Green* (1970) 399 U.S. 149, 162 [26 L.Ed.2d 489, 499, 90 S.Ct. 1930].) It has said, however, that

"hearsay rules and the Confrontation Clause are generally designed to protect similar values," (*id.*, at p. 155 [26 L.Ed.2d at p. 495]) and "stem from the same roots." (*Dutton* v. *Evans* (1970) 400 U.S. 74, 86 [27 L.Ed.2d 213, 225, 91 S.Ct. 210].) Both are intended to further the accuracy of the fact-finding process. (*Ohio* v. *Roberts* (1980) 448 U.S. 56, 64 [65 L.Ed.2d 597, 606, 100 S.Ct. 2531]; *People* v. *Stritzinger, supra,* 34 Cal.3d at p. 515.) But the two are not coterminous; a statement otherwise admissible under the hearsay rule may be prohibited from introduction into evidence by the confrontation clause.

In *Ohio* v. *Roberts, supra,* 448 U.S. 56, the high court held that "[t]he Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay." (*Id.*, at p. 65 [65 L.Ed.2d at p. 607].) First, it establishes a "rule of necessity": the prosecution must demonstrate the unavailability of the declarant. Then, it requires the existence of " 'indicia of reliability' " to insure the "trustworthiness" of the hearsay statement. (*Id.*, at pp. 65, 66 [65 L.Ed.2d at pp. 607-608].) In *Dutton* v. *Evans, supra,* 400 U.S. 74, the court listed four indicia of reliability in determining that a hearsay statement had not violated the defendant's right to confrontation: (1) the statement contained no express assertion about past fact; (2) the declarant's personal knowledge of the contents of his statement was abundantly established; (3) the possibility that the declarant's statement was founded on faulty recollection was remote in the extreme; (4) the circumstances under which the declarant made the statement were such as to give reason to suppose the declarant did not misrepresent defendant's involvement in the crime. (*Id.*, at pp. 88-89 [27 L.Ed.2d at pp. 226-227].) The court also mentioned spontaneity as a factor weighing in favor of reliability. (*Id.*, at p. 89 [27 L.Ed.2d at p. 227].)

Since *Dutton,* several courts have dealt with constitutional challenges to hearsay exceptions analagous to section 1240, and have held that introduction of such statements did not violate the confrontation clause. (*McLaughlin* v. *Vinzant* (1st Cir. 1975) 522 F.2d 448, cert. den., 423 U.S. 1037 [46 L.Ed.2d 412, 96 S.Ct. 573]; *Shaffer* v. *Field* (9th Cir. 1973) 484 F.2d 1196; *United States* v. *Nick* (9th Cir. 1979) 604 F.2d 1199; *United States* v. *Iron Shell* (8th Cir. 1980) 633 F.2d 77, cert. den. (1981) 450 U.S. 1001 [68 L.Ed.2d 203, 101 S.Ct. 1709]; *Haggins* v. *Warden, Fort Pillow State Farm* (6th Cir. 1983) 715 F.2d 1050, cert. den. (1984) — U.S. — [79 L.Ed.2d 217, 104 S.Ct. 980]; *Brown* v. *Parratt* (D.Neb. 1975) 406 F.Supp. 1357, affd. (8th Cir. 1976) 529 F.2d 998; *State* v. *Bray* (1970) 106 Ariz. 185 [472 P.2d 54]; *People* v. *Kelley* (1971) 32 Mich.App. 126 [188 N.W.2d 654]; *People* v. *Orduno* (1978) 80 Cal.App.3d 738 [145 Cal.Rptr. 806],

cert. den. (1979) 439 U.S. 1074 [59 L.Ed.2d 41, 99 S.Ct. 849].)

*People* v. *Orduno, supra,* 80 Cal.App.3d 738, held that the spontaneous declaration of a child victim who was too young to qualify as a competent witness was admissible against a claim of denial of confrontation. "The victim of the offense was a child of three years nicknamed Scooter. On November 8, 1976, Scooter left her mother's apartment at 3:30 p.m. wearing only panties. Together with three young boys who lived in the area, Scooter entered defendant's apartment where the children watched cartoons on television. Defendant called the children into the bedroom and gave them each licorice. He told the three boys to leave. At about 3:35 p.m., Scooter's mother went to look for her. She saw Scooter running from the direction of defendant's apartment with licorice in her hand. Scooter was crying and said something the mother did not understand. The mother asked the child if she had wet her pants. The child said, 'No. That man got my pants wet.' The mother asked, 'What man?' and the child pointed to defendant's apartment. The mother took Scooter home and, under further questioning, the child said, 'That man stuck his pee pee in my bummy.' Scooter had been taught to use 'pee pee' for her vaginal area and 'bummy' for her anal area. [¶] Spermatozoa was found on the child's skin in the vaginal area and on the panties. Defendant admitted in a police interview that he took the child on his lap and that ejaculation followed, but maintained that it was an accident, that he had not removed the child's panties, and that his own pants had a broken zipper. [¶] At the preliminary hearing the victim was called as a witness but was found to be incompetent to testify because of her age. Thereafter the mother testified, over defendant's objections, to the child's statements following the incident." (*Id.,* at pp. 741-742.)

The *Orduno* court found the statement to comply with section 1240 and sufficient to withstand constitutional scrutiny under the confrontation clauses.

▅▅▅▅ We conclude the statement in issue in the instant case does not violate defendant's right of confrontation. The declarant is obviously unavailable and sufficient indicia of reliability appear to insure the trustworthiness of the statement. The victim made the same statement twice in response to a neutral inquiry from the first physician to see him. He had just received third degree burns over his torso, was in a form of shock, was obviously in a position to observe the event he described, and made the statement shortly after the incident. Further, the statement was substantially corroborated by the testimony of Wardell, a percipient witness.

The judgment is affirmed.

Low, P. J., and King, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 18, 1984.