Filed 3/6/14  P. v. Jordan CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B245767 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA382821) |
| v. | |
| D'WAYNE JORDAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, John S. Fisher, Judge.  Affirmed with directions.

Murray A. Rosenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II, William H. Shin and Alene M. Games, Deputy Attorneys General, for Plaintiff and Respondent.

\*\*\*\*\*\*\*\*\*\*\*\*

A jury convicted appellant D'Wayne Jordan of assault by a public officer (Pen. Code, § 149),[1] corporal injury of a child (§ 273d, subd. (a)), assault by means likely to produce great bodily injury (§ 245, subd. (a)(4)), and child abuse (§ 273a, subd. (a)). Appellant contends the trial court erred when it admitted statements about prior incidents pursuant to the spontaneous statement exception. He also contends it erred when it imposed concurrent terms on three of the four counts. Respondent concedes this latter point. We order an amended abstract of judgment but otherwise affirm.

## FACTS AND PROCEDURE

### 1. *Charged Incident*

In February 2009, Guillermo H. was 13 years old and was housed at Los Padrinos Juvenile Hall. Appellant was a Detention Services Officer (DSO) there. The minors in Guillermo's unit were "acting up" one day, and the staff had locked them in their rooms for the day. Guillermo had to use the restroom. They did not have restrooms in their rooms, and he pounded on his door for 10 to 15 minutes before a staff member came to take him to the restroom. He was told to go use the restroom and then see appellant, which he did. When he arrived at appellant's office, appellant told him to sit on the floor. Guillermo squatted down against the wall. Appellant told him to sit rather than squat, and Guillermo refused. Appellant got close enough to where his knees were two to three inches from Guillermo's face, and Guillermo put his open palms up in front of his face. Appellant hit Guillermo in the head with a closed fist, and Guillermo fell over to the floor. Appellant continued to "constantly" hit Guillermo after he fell over. He also felt appellant get on top of him and pull his hair and slam his head against the floor. He remembers seeing his tooth fly out of his mouth. Guillermo screamed for appellant to stop.

DSO Simon Fonseca was standing outside the door to appellant's office and saw Guillermo go inside. He heard appellant tell Guillermo to sit down and saw Guillermo sit

---

[1] Further undesignated statutory references are to the Penal Code.

against the wall. The door to the office was cracked open. He heard appellant ask Guillermo "what's his problem," and Guillermo said, "Nothing. I just want to use the rest room." Then he heard, "Get off me. Get off me," and some "thumps." He saw appellant knee Guillermo in the face and hit him in the head. He heard appellant yell for handcuffs, and he went in to give them to appellant. After appellant handcuffed Guillermo, he instructed Fonseca to take him to the special housing unit. When the DSO in the special housing unit saw Guillermo, he said he would not accept him and directed DSO Fonseca should take Guillermo to the nurse.

Marianne Sorensen was the nurse on duty. Guillermo was initially scared to tell Sorensen what happened and denied anything was wrong. She asked DSO Fonseca and the other DSO who had escorted Guillermo to leave them alone, and when they left, Guillermo burst into tears and explained the incident with appellant. The nurse noted hematoma on Guillermo's right brow and left temporal area, abrasions in the left temporal area, an abrasion on his left arm, a broken tooth, and a laceration on his lower lip. Guillermo was sent to a county hospital, and Sorensen filed a child abuse report with the Downey police.

Appellant testified in his own defense. He recalled Guillermo kicking the door of his room so hard it sounded like it would come off the hinges, and when Guillermo was brought down to the office, Guillermo looked furious. Appellant told him to sit down on the floor, and when he squatted instead of sitting, appellant repeated the order. Appellant heard Guillermo say, "Fuck you, bitch. Fuck staff." Then appellant saw "a fist . . . coming," and he "rolled with it." They both ended up on the ground with appellant on top of Guillermo. Guillermo was trying to kick and was struggling with him, and appellant yelled for DSO Fonseca to bring handcuffs.

## 2. *Prior Incident Involving Minor in 2008*

On March 28, 2008, Markese P. was housed at Los Padrinos Juvenile Hall. That day, Markese and some other minors were in a day room watching television. Some of the minors were acting disrespectfully to new staff members. When appellant saw this, he ordered everyone back to their rooms. Markese told appellant he did not think it was

fair for everyone to go back to their rooms because only some of them were acting disrespectfully. Appellant gave Markese "a funny look" but did not otherwise respond, and everyone returned to their rooms. Two or three minutes later, another staff member unlocked Markese's room and said appellant wanted to talk to him. Markese went to a control room office where appellant was waiting for him with DSO Delshawn Sheppard, who was senior to appellant. They had him sit on the ground. Appellant told him, "Don't you ever speak without me . . . speaking to you about the situation." Then he slapped Markese in the face causing Markese to fall over, and he continued to hit and kick Markese until DSO Sheppard pulled appellant off Markese. Markese had bruised and fractured ribs and a cut on his head. He was taken back to his room. He did not report this incident to any other staff members because he was afraid of retaliation. He told his mother about it when she came to visit that same week. She complained to a supervisor, and Markese was questioned about the incident. He did not tell the investigators the truth at first because he was still afraid of retribution. He eventually told supervising DSO Sheila Cervantes about the incident after his mother reported it. DSO Cervantes believed he was reluctant to talk about it at first, but she developed a rapport with him that allowed him to trust her.

Appellant testified that he did not come into any physical contact with Markese. He said he only talked to Markese in his office, and then Markese returned to his room. Appellant recalled receiving a letter from the probation department saying that Markese's allegations against him were unfounded.

### 3. *Evidence of Prior Incidents of Domestic Violence*

During the prosecution's rebuttal case, it adduced evidence of domestic violence between appellant and his girlfriend, Barbara Weeks. Weeks did not testify at trial. Some of her statements came in through Officer Julio Estrada of the Los Angeles Police Department. Officer Estrada received a call at approximately 4:10 a.m. on June 13, 2009, to respond to a pay phone where Weeks was waiting. Officer Estrada observed that Weeks's hair was disheveled, she was shaking and teary-eyed, and she had dried blood on her face. She told the officer that between 2:45 and 3:00 a.m. that morning, appellant

4

came to her apartment very agitated and upset, and he was banging on her door. He was upset because she had left his home earlier, at around 2:00 a.m., when he had passed out after drinking. Appellant grabbed Weeks by her hair, dragged her around the living room, and kicked and punched her in the face several times. He then dragged her to the bedroom, where he simulated a knife in his pocket and threatened to stab her. He ordered her to orally copulate him, and after she did so, he passed out. She waited approximately 10 to 15 minutes to make sure he was completely out, and then she drove to the pay phone and called 911. Officer Estrada spoke to Weeks for 10 to 15 minutes at the pay phone. He then called for backup and went to her apartment at approximately 5:10 a.m., where he found appellant on her bed, nude except for a tank top. He saw what appeared to be dried blood stains in the living room and bedroom of Weeks's apartment.

Weeks's statements about a second incident came in through another police officer, Officer Marisol Bazan of the Gardena Police Department. On May 12, 2009, at approximately 6:30 p.m., Officer Bazan responded to a call from a pay phone, where she made contact with Weeks. Weeks was nervous, crying, shaking, and looking around. She told Officer Bazan she was assaulted by appellant. Weeks said that at approximately 4:00 p.m. that day, she was visiting appellant at his home, and he became upset with her because she was wearing her wedding ring. She threatened to leave, and he attacked her. He got on top of her, straddled her, and choked her. He told her, "You're not leaving until we have sex." He removed her underwear and his boxer shorts and attempted to have intercourse with her, but she was able to escape his hold. She grabbed her cell phone from her purse; appellant took it from her before she could make any calls. She then saw him grab what appeared to be a holster for a handgun, and she ran out of the apartment. She went to her car and drove to the pay phone, where she called the police. Officer Bazan noted red marks on Weeks's neck.

Appellant testified on surrebuttal that Weeks was actually his wife. He had known her since 2006, and they were married on May 4, 2009. Appellant was never charged with any offenses against Weeks.

5

### 4. *Sentencing*

As noted previously, the jury convicted appellant of assault by a public officer, corporal injury of a child, assault by means likely to produce great bodily injury, and child abuse. The court sentenced appellant to four years in state prison consisting of four years for the child abuse count and 121 days each for the remaining three counts, which were to run concurrently with the four-year term.

## DISCUSSION

### 1. *The Trial Court Did Not Err in Admitting Weeks's Statements to Officers*

Appellant contends Weeks's statements to police officers on May 12 and June 13, 2009, were inadmissible hearsay that did not fall under the spontaneous statement exception, which was the hearsay exception on which the court relied. We hold the court did not err in applying the spontaneous statement exception.

Evidence Code section 1240 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." Appellant argues Weeks's statements did not meet the spontaneity prong because she made them over an hour after the incidents occurred, and she appears to have made them in response to questioning by officers.

Whether a statement meets the requirements of the spontaneous statement exception is "largely a question of fact." (*People v. Poggi* (1988) 45 Cal.3d 306, 318.) Thus, whether a declarant made a statement ""*under the stress of excitement*"" is a factual determination for the trial court, which we will uphold if supported by substantial evidence. (*People v. Brown* (2003) 31 Cal.4th 518, 541.) We review for abuse of discretion the court's overall decision to admit or exclude evidence as spontaneous statements. (*People v. Phillips* (2000) 22 Cal.4th 226, 236.)

"A spontaneous statement is one made without deliberation or reflection." (*People v. Raley* (1992) 2 Cal.4th 870, 892-893.) "[T]he basis for the circumstantial trustworthiness of spontaneous utterances is that in the stress of nervous excitement, the

6

reflective faculties may be stilled and the utterance may become the instinctive and uninhibited expression of the speaker's actual impressions and belief. [¶] The crucial element in determining whether a declaration is sufficiently reliable to be admissible under this exception to the hearsay rule is . . . the mental state of the speaker. The nature of the utterance—how long it was made after the startling incident and whether the speaker blurted it out, for example—may be important, but solely as an indicator of the mental state of the declarant." (*People v. Farmer* (1989) 47 Cal.3d 888, 903-904, overruled on another point in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6.)

"When the statements in question were made and whether they were delivered directly or in response to a question are important factors to be considered on the issue of spontaneity. [Citations.] But . . . '[n]either lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity *if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance.*'" (*People v. Poggi*, *supra*, 45 Cal.3d at p. 319.)

In this case, substantial evidence supported the trial court's determination that Weeks's statements were spontaneous. On May 12, 2009, the incident with appellant started approximately two and a half hours before Weeks spoke to Officer Bazan. Even though in theory she had time to reflect and calm down before speaking to Officer Bazan, there was evidence she had not reflected and was still under the stress of excitement. She was crying and shaking when she spoke to the officer, and she was looking around and appeared nervous. She had undergone a disturbing ordeal in which appellant choked Weeks, forcibly undressed her, tried to force her into intercourse, grabbed a gun, and took her cell phone, but Weeks was able to get away and drive to a pay phone where she called 911. Similarly, on June 13, 2009, approximately an hour and 10 minutes had passed between the time appellant attacked Weeks and when she spoke to Officer Estrada, but she was still shaking, teary-eyed, and disheveled, and she had dried blood on her face when she talked to the officer. Appellant's attack this time was just as disturbing; he kicked her, punched her, threatened to stab her, and forced her to orally

7

copulate him.  The evidence amply justifies a conclusion that Weeks continued to labor under the emotional influence of these disturbing events on both occasions, so much so that she was still shaking and crying an hour to two and a half hours later.

Our Supreme Court and other Courts of Appeal have held on several occasions that statements were admissible under this exception after substantial time lapses and under similar circumstances.  (See, e.g., *People v. Clark* (2011) 52 Cal.4th 856, 926 [statement made to doctor two to seven hours after disturbing events were admissible because evidence of declarant's mental and physical condition showed she was still under the influence of stress and shock]; *People v. Poggi, supra*, 45 Cal.3d at p. 319 [statements made to officer approximately 30 minutes after attack were admissible because declarant was still under the influence of attack and remained excited, even though she had become calm enough to speak coherently]; *People v. Jones* (1984) 155 Cal.App.3d 653, 658, 662 [statements to doctor made 30 to 40 minutes after injury were admissible when declarant was severely injured, dazed, and appeared to be in shock].)  "[W]idely varying quantities of time lapse have been permitted" because each case should be treated according to its own facts.  (*People v. Jones, supra*, 155 Cal.App.3d at p. 661.)  Here, we cannot say the trial court abused its discretion.

### 2.  *The Sentence on Counts I, II, and III Should Be Corrected*

Section 654, subdivision (a) provides:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  "'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor.  If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.'"  (*People v. Alford* (2010) 180 Cal.App.4th 1463, 1468.)

Appellant contends there was no showing that he entertained multiple objectives with his course of conduct towards Guillermo; the evidence showed he acted with a single intent or objective of physically punishing Guillermo.  Respondent concedes the

point. In such a case, the "[i]mposition of concurrent sentences is not the correct method of implementing section 654, because a concurrent sentence is still punishment. [Citations.] [T]he imposition of concurrent terms is treated as an implied finding that the defendant bore multiple intents or objectives, that is, as a rejection of the applicability of section 654." (*People v. Alford, supra*, 180 Cal.App.4th at p. 1468.) Instead, in a single objective case, the trial court should impose a sentence on each count, but stay the execution of sentence as necessary to comply with section 654. (*Ibid.*)

Here, the court imposed four years in state prison on count IV for child abuse and 121 days each on counts I, II, and III (assault by a public officer, corporal injury of a child, and assault by means likely to produce great bodily injury, respectively). Counts I through III were "wobblers"—that is, offenses that may be sentenced alternately as felonies or misdemeanors in the trial court's discretion. (§ 17, subds. (a), (b); *People v. Park* (2013) 56 Cal.4th 782, 789.) Each could have been punished by (1) a term from a felony triad, *or* (2) a fine or term in the county jail not exceeding one year. (§ 149 [assault by public officer punishable by 16 months, two years, or three years in county jail under § 1170, subd. (h), or fine or county jail term not exceeding one year]; § 273d, subd. (a) [corporal injury of a child punishable by two, four, or six years in county jail under § 1170, subd. (h), or fine or county jail term not exceeding one year]; § 245, subd. (a)(4) [assault by means likely to produce great bodily injury punishable by two, three, or four years in state prison, or fine or county jail term not exceeding one year].) By choosing not to sentence appellant from the available triads and instead choosing to sentence him to 121-day terms, the court exercised its discretion to sentence these wobbler offenses as misdemeanors. (§ 17, subd. (b).)

The court should not have ordered the 121-day terms to run concurrently, however. Pursuant to section 654, the court should have stayed the sentence on these counts. The abstract of judgment should be corrected to show the sentence on counts I, II, and III is stayed. Additionally, the abstract of judgment incorrectly lists each term as 120 days instead of 121 days. The reporter's transcript and the minute order from the

9

sentencing hearing each show the court ordered 121-day terms.  The abstract of judgment should be corrected in this respect as well.

## DISPOSITION

The trial court is directed to prepare an amended abstract of judgment that reflects 121-day terms on counts I, II, and III, all of which are stayed pursuant to section 654. The court shall forward a copy of the amended abstract to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


FLIER, J.


We concur:


BIGELOW, P. J.


GRIMES, J.


10