[Crim. No. 18576. Second Dist., Div. Two. Apr. 26, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
NICHOLAS RICCO PINN, Defendant and Appellant.

**COUNSEL**

Paul T. Locke, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and John R. Evans, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**HERNDON, J.**—Appellant was found guilty of second degree murder after a nonjury trial and was sentenced to state prison for the term prescribed by law. Pursuant to a stipulation to which appellant gave his personal approval after he had been fully advised of his constitutional rights by his counsel and by the court, a jury trial was waived and it was agreed that the court might read and consider the testimony of eight named witnesses who had testified at appellant's preliminary hearing, both sides reserving the right to introduce additional evidence and to recall for further examination or cross-examination any of said witnesses who had testified at the preliminary hearing.

In the course of the trial the prosecution called nine other witnesses. The defense called only one witness, a police officer who had testified previously and this for the limited purpose of laying the foundation for the playing of a tape recording of a conversation between two police officers and one of the witnesses who had been called by the prosecution. The defense rested after introducing written statements which had been given to the police by appellant and by four of the witnesses. Appellant did not testify.

The sole contention advanced and argued by appellant is that the trial court erred in denying his motion to strike the testimony of a witness to the effect that a few hours prior to her death the victim of the murder had told the witness that "he [appellant] was going to kill her, and she wanted to get into the house to get some clothes and find my grandmother's gun." We have concluded, first, that the ruling of the trial court was correct, and, secondly, that even if it be assumed, *arguendo*, that the ruling was erroneous, it was harmless beyond a reasonable doubt in view of the overwhelming evidence of guilt.

In view of the fact that the sufficiency of the incriminating evidence to support the judgment is unquestioned and unquestionable, and in view of the nature of the single assignment of error advanced by appellant on this appeal, we deem it unnecessary to lengthen this opinion with a repetition of the summary of the evidence which is set forth on the first 28 pages of appellant's 32-page brief. Reference also is made to the substantially consistent and corroborative summary to which the first 23 pages of respondent's brief are devoted.

Barbara Perry died shortly after midnight on August 10, 1968. Her death was caused by massive hemorrhage due to lacerations of the vagina and internal genitalia. Medical opinion indicated that the fatal wounds could have been inflicted only by a cutting instrument with a sharp cutting edge. The instrument must have been at least three to four inches in length and must have required the insertion into the vagina of the hand which held it. As described by the doctor who made a post mortem examination, "From the amount of damage done there was a distinct cutting. There was a distinct cutting as it was slicing. There was not a straight stab and pull-out. There was cutting due to the extent of the damage which was quite severe."

Tests showed a 2.1 milligram percent of secobarbital or a fast acting barbiturate in the blood. That percentage is within lethal range depending on the tolerance of the particular person. This finding did not change the examining doctor's opinion as to the cause of death, that is, massive hemorrhage and resultant shock.

The evidence, apart from appellant's own self-incriminating statements, establishes to a virtual certainty that it was appellant who inflicted these fatal wounds. Appellant's own statements made to his friends at the scene of the crime immediately after its commission and those which he made to the police officers on the following morning leave no room for doubt of his guilt.

There is a plenitude of credible evidence that during the afternoon and evening preceding the murder, appellant plied Barbara with narcotic pills to the point that she became highly intoxicated and at times lapsed into a comatose state. The inference is practically inescapable that appellant employed the narcotics and took Barbara to the isolated scene of the crime in pursuit of a preconceived determination to have sexual relations with her. There is credible testimony in the record that during the afternoon immediately preceding the crime appellant was carrying in his belt "a straight razor with a black handle of the type barbers use."

The testimony which is the subject of appellant's assignment of error was given by the witness Dexter Pledger, Barbara's 12-year-old nephew. He testified that at about 5 o'clock on the evening of August 9, appellant and Barbara, with two companions, appeared at the home where the witness and Barbara lived with his grandmother. He testified that Barbara "told me he [appellant] was going to kill her, and she wanted to get into the house to get some clothes and find my grandmother's gun." The witness further testified that appellant, Barbara and their two companions later went into the kitchen where appellant "showed us some pills." They were described as red capsules, about 12 in number. When asked what happened after appellant had exhibited the capsules, the witness responded, "Then he [appellant] got a glass of water for her, then she took them." Further testimony on this subject is recorded as follows:

"Q. When he gave her the glass of water what happened right then? A. Then he tried to give her the pills. Q. When you say 'he tried to give her the pills' exactly what did he do? A. He gave her the pills. Q. He gave who the pills? A. Barbara. Q. Did he put them in her hand? A. Yes. Q. Then what did he do? A. Then he got a glass of water for her. Q. Then what happened? A. Then she put them up to her mouth, but she didn't want them. Q. How do you know that she didn't want them? A. Because she put them back down. Q. Then what did the defendant do, if anything? A. So he pushed her hand up to her mouth. Q. Then what did he do? A. Gave her the water. Q. Did you see Barbara's hand again? A. Yes. Q. Was it empty then? A. Yes. Q. Barbara did take the pills then? A. Yes. Q. Did Ricco give Barbara all of the pills he had in his hand? A. Yes. Q. And there were about 12, did you say? A. Yes."

■  Appellant contends that the testimony "She told me he was going to kill her, and she wanted to get into the house to get some clothes and find my grandmother's gun" should have been stricken as inadmissible hearsay. We disagree. Evidence Code section 1250, subdivision (a) provides: "Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when:

"(1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or

"(2) The evidence is offered to prove or explain acts or conduct of the declarant."

An examination of recent decisions leads to the conclusion that the statement here in question was properly admitted to prove or explain acts and conduct of the declarant. (*People* v. *Ireland,* 70 Cal.2d 522, 530, fn. 6 [75 Cal.Rptr. 188, 450 P.2d 580]; *People* v. *Spencer,* 71 Cal.2d 933, 944-946, fn. 15 [80 Cal.Rptr. 99, 458 P.2d 43]; see also *People* v. *Brust,* 47 Cal.2d 776, 784-785 [306 P.2d 480]; *People* v. *Finch,* 213 Cal.App. 2d 752, 765 [29 Cal.Rptr. 420].)

The statement of the decedent involved in *People* v. *Ireland, supra,* was held inadmissible because the nature of the defense and the uncontradicted evidence were such that no issue with respect to decedent's conduct immediately preceding her death was presented. The undisputed evidence in *Ireland* established that the victim was reclining on a couch when she was shot by the defendant. In the later case of *People* v. *Spencer, supra,* 71 Cal. 2d 933, the Supreme Court explained and distinguished *Ireland* in holding admissible the evidence of a statement of the decedent to the effect that she was going to break off, her lesbian relationship with the defendant and "might get killed over it." The following quotation from *Spencer* at pages 945-946 is particularly apposite: "The issue of self-defense had been raised by defendant both at the preliminary hearing, the transcript of which was made part of the evidence at trial, and by defense counsel's opening statement to the court. It was thus proper for the People to introduce evidence that defendant was the aggressor. Reasonably interpreted, Emily's statement that 'I might get killed over it. . . .' expresses her fear that defendant might become violent once Emily broke up with her. From this fear it could be inferred that Emily was not the aggressor and that in fact defendant attacked Emily. As we said in *People* v. *Lew, supra,* 68 Cal.2d at page 779 [69 Cal.Rptr. 102, 441 P.2d 942]: 'Or had defendant claimed self-defense, he would have placed Karen's [the victim's] state of mind at

issue since a claim of self-defense requires the trier of fact to find that the other party was the aggressor, the prosecution, through rebuttal testimony, could have shown that *Karen was apprehensive and not likely to be aggressive.* Her fear would then have been a factor properly before the fact-finder in its deliberations on the defendant's claim of self-defense.' (Italics added.) (Citing *People* v. *Atchley* (1959) 53 Cal.2d 160, 172 [346 P.2d 764].)

"Our determination herein also is in accord with what we recently said in *Ireland* with respect to the application of section 1250. In that case the trial court permitted the prosecution to introduce the hearsay statement of the victim that, 'I know he's [defendant] going to kill me. I wish he would hurry up and get it over with. He'll never let me leave,' as being relevant to rebut an alleged inference that the deceased was the aggressor. We held that the admission of that hearsay statement was error because 'the defense *did not raise any issue of fact* with respect to [the deceased's] conduct immediately preceding her death. The undisputed evidence . . . established that [the deceased] was reclining on a couch when she was shot by defendant.' (Original italics.) (70 Cal.2d at pp. 530-531.) Unlike *Ireland,* this claim of self-defense in the instant case raises a question of fact with respect to Emily's conduct on May 5, i.e., whether or not she was the aggressor, and therefore her statement is admissible 'to prove or explain [her] acts or conduct.' (§ 1250, subd. (a)(2).)"

In the case at bench the defense introduced into evidence lengthy statements of the appellant and of other witnesses describing in considerable detail the conduct and actions of Barbara and himself during the afternoon and evening immediately preceding the murder. According to appellant's version, he visited no act of compulsion or violence upon Barbara but rather that she willingly had engaged with him in "heavy petting" during the afternoon and later went with him to the isolated place where she received her fatal wounds and there voluntarily engaged with him in an act of sexual intercourse.

According to appellant's own statement, he had known Barbara before but had not seen her for three years. Evidence that Barbara was afraid of appellant and fearful that he might kill her tended to explain her conduct in taking an overdose of barbiturate pills at appellant's insistence and against her will and in accompanying him to the isolated place where the fatal episode occurred. Evidence of the victim's statement indicating her fear of appellant not only provided a basis for reasonable inferences contradictory of appellant's version of the relevant events, including Barbara's actions, but it also provided a basis for the reasonable inference that Barbara probably repelled his sexual advances and that it was this action on her part

which caused appellant to attack her and inflict upon her the wounds which caused her death.

■ We observe that evidence admissible under Evidence Code section 1250 is limited by section 1252 which provides that: "Evidence of a statement is inadmissible under this article if the statement was made under circumstances such as to indicate its lack of trustworthiness." Appellant contends that the evidence here in question was inadmissible for the reason that Dexter's testimony was impeached in certain details. ■ In *People* v. *Spencer, supra,* 71 Cal.2d 933, 946, the Supreme Court rejected a similar argument stating: "In making this contention defendant misconceives the meaning of section 1252. That section has reference to the *statement made by the hearsay declarant* . . . not to the testimony of the witness who relates the hearsay statement to the trier of fact." (Original italics.) Paraphrasing the language of *Spencer* which immediately follows the foregoing quotation, "The determination in the instant case is thus whether there is 'at least substantial evidence that [the statements] [of Barbara] are probably trustworthy and credible.' "

As pointed out in the *Spencer* decision at page 947, it was said in *People* v. *Hamilton,* 55 Cal.2d 881, 895 [13 Cal.Rptr. 649, 362 P.2d 473], that " 'the declarations, being those of a present existing state of mind, made in a natural manner and not under circumstances of suspicion, carry the probability of trustworthiness.' "

■ In the instant case, as in *Spencer,* the appellant has not directed our attention to anything in the record indicating that Barbara made the statement to Dexter in other than a natural manner. No motive for Barbara to lie has been shown and in the light of the past relations between appellant and Barbara as indicated by the testimony of several witnesses, it was not unreasonable for her to foresee the possibility of violence on the part of appellant. Nothing, therefore, tends to indicate that Barbara's statement was untrustworthy; it was therefore admissible under section 1250.

■ Finally in view of the massive accumulation of incriminating evidence, the refusal of the trial judge to strike the challenged statement could not have been prejudicial under any definition of prejudicial error. The uncontradicted evidence of appellant's companions as well as appellant's own statements conclusively establish the fact that appellant was alone with Barbara during the 20-minute period when she received her fatal injuries. The uncontradicted evidence conclusively establishes the fallacy of appellant's inherently improbable assertions that Barbara had suffered a miscar-

riage—his explanation of the profuse bleeding which he, of course, had observed.

■ Appellant's contention that he was denied his Sixth Amendment right to confrontation of witnesses by the admission of the hearsay statement deserves only summary rejection. In *People* v. *Spencer, supra,* the Supreme Court refused to hold that the application of section 1250 in a similar factual situation constituted a violation of the right to confrontation. It is well settled that established exceptions to the hearsay rule do not operate as violations of the confrontation clause. (*Dutton* v. *Evans,* 400 U.S. 74, 83-85 [27 L.Ed.2d 213, 223-225, 91 S.Ct. 210]; *People* v. *Washington,* 71 Cal.2d 1061, 1075-1076 [80 Cal.Rptr. 567, 458 P.2d 479].)

The judgment is affirmed.

Roth, P. J., and Fleming, J., concurred.