[No. D010962. Fourth Dist., Div. One. May 3, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
EDWARD FRANCIS PEARCH et al., Defendants and Appellants.

COUNSEL

Handy Horiye and Christopher Blake, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Pat Zaharopoulos and Sara Gros-Cloren, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KREMER, P. J.—Edward Francis Pearch and Jonathan Darrell Strawn appeal their convictions by a jury of second degree felony murder with a firearm (Pen. Code, §§ 187, 12022, subd. (a)) based on a killing during a kidnapping. On appeal, Pearch and Strawn contend the judgment must be reversed because the court erroneously admitted a hearsay statement by the victim, the court should have instructed on when a kidnapping ends and because simple kidnapping cannot serve as the basis for a second degree felony murder conviction. Strawn also contends the prosecutor committed misconduct during his cross-examination. We reverse.

FACTS

In mid-August 1988, Kirk Wirth with two unidentified men and a man who looked similar to victim Victor Flores robbed John Ratz at his home in San Clemente. Among the things the men took from Ratz was his white Porsche which had personalized license plates saying "BLUZBOY." Ratz knew Wirth. He did not know the other men.

On August 25, 1988 in Oceanside, Pearch was driving the white Porsche and Strawn was a passenger when the police stopped the car for an equipment violation.

Two days later, on August 27, Strawn and Pearch bought a shotgun at the Costa Mesa Gun Shop. Strawn told the store owner he wanted a gun for shooting birds from the window of a truck. The shop owner testified the ammunition he sold Strawn was "basically an anti-personnel type load," not the kind of ammunition one would use for hunting. Strawn testified he and Pearch bought the shotgun for Wirth with Wirth's money. According to Strawn, Wirth said he wanted "a big scary gun" to carry when he bought some drugs from some rough people in a rough neighborhood.

About 5 to 6 p.m. that same day, Strawn, Pearch and Wirth went to Chula Vista to see Flores. They knocked at the door of Flores's trailer which was located behind his parents' home. When Flores did not answer, Strawn knocked on the door of the parents' house and asked if Flores was home. The father explained Flores lived in the trailer.

Later that night, about 3 a.m., Flores's mother was awakened by a commotion in Flores's trailer. She got up, went to the window and yelled to Flores "What's going on?" After a moment, it became quieter and Flores answered, "No, Mother, don't worry about it. Nothing is happening." A later investigation of the trailer did not reveal any signs of a struggle. The mother heard a lot of quick footsteps and then her son's truck leaving quickly. Both parents also saw the white Porsche at that time and heard it leave.

Flores, Wirth, Pearch and Strawn drove to Carlsbad in Flores's truck and in the Porsche. About 8 a.m., Wirth tried to get a room at the Lexington Suites Hotel but was told there was no room then available and told to try again later in the morning. They returned about 8:30 a.m. and were given room 211. Wirth filled out the registration card using Strawn's name and listed the white Porsche. About noon, Pearch, who according to Strawn had been dropped off at the beach, arrived at the hotel and contacted Strawn and the others.

Flores called his parents' house twice. The first time his son answered the phone. He told his son to go outside and look for his wallet in the shrubs. The son looked for the wallet but did not find it. About 1 p.m., he phoned again and talked to his mother. He asked her to look for the wallet in the shrubs. She looked for it but could not find it. She asked him where he was and what he was doing. He answered, "Don't worry, mother. I'm here with two voluptuous blonds." A neighbor had found Flores's wallet about 6 or 6:30 a.m. and had dropped it in the Flores mailbox. There was no money in the wallet.

At the Lexington Suites Hotel, Flores spent some of the afternoon standing on the balcony just outside room 211, leaning over the railing, smoking

a cigarette and watching the people around the pool. Flores stood on the balcony for 45 minutes to an hour, sometime between 2 and 3:30 p.m. He appeared normal and relaxed to other guests at the hotel.

About 4:30 p.m., Flores called his brother. He spoke in English, which was very unusual and he seemed nervous. Flores asked if he could borrow $5,000. When the brother asked why he needed the money, Flores said his friend had stolen $5,000 and he needed to pay it back. Flores said he was being hurt. When the brother asked why he had to pay it back, Flores started to explain but the call was disconnected.

At about 5:45 p.m., someone in room 211 (i.e., Pearch, Strawn or Wirth) shot Flores with the shotgun. The shooter apparently tried to muffle the sound of the shotgun blast by shooting through one of the cushions in the room. Strawn came out of the room, then reentered, closing the door behind him. About 30 seconds later, he, Pearch and Wirth ran out of the room. They left behind the shotgun. They ran down the stairs, got into the Porsche and drove away.

Flores died from a shotgun wound to his chest. He died within a few seconds or minutes after he was wounded. Flores's blood-alcohol level was .04 at the time of his death. Flores also had Valium and relatively high levels of cocaine's metabolite in his system at the time of his death. There was testimony that this combination of alcohol and drugs "are known to be the most dangerous combination that a person could use, in terms of potential for violence." Sometime before he died, Flores was bruised on the outer side of this right eye and near the tip of his nose. It was possible these bruises could have occurred within 24 hours of his death. At the time he died, Flores had a folding knife in his shirt pocket.

After the shooting, Strawn, Pearch and Wirth drove about three or four miles to the Travel Inn in Carlsbad. Strawn and Pearch checked into the hotel, using a false name. Pearch took out "quite a wad of money" to pay for the room. By 6:30 p.m., Pearch and Strawn had called for a cab to take them to San Clemente. The cab driver testified they seemed to be "fairly intoxicated." At the Travel Inn they left behind a bag of clothes which contained, among other things, Pearch's interim driver's license.

*Defense Evidence*

Strawn testified he met Wirth through Pearch about a week before the killing. The three of them drove from Orange County to San Diego because Wirth wanted to buy some drugs. At Wirth's direction and with Wirth's money, he and Pearch bought a shotgun for Wirth. When the trio failed to

find Flores during the afternoon of August 27, they checked into a hotel room in Chula Vista where Strawn fell asleep. He did not awaken until Pearch and Wirth returned to the motel between 3 to 4 a.m. with Flores, all of them being "real happy."

After ingesting some cocaine, the group drove to Carlsbad. Flores wanted to stay at the Lexington Suites Hotel, see some friends and get some samples of cocaine. During the day, Flores at one point left to get something to eat and drink and was gone for about 30 minutes. Later Flores and Wirth left for about 45 minutes and returned with a sample of cocaine. Wirth and Flores argued about the Porsche. Strawn testified: "Flores was mad because he said that stuff he got wasn't worth as much as the Porsche and that he'd been ripped off." Strawn testified "Wirth's attitude was that he—it was his car and he didn't want to sell it." At this point, Strawn went into the other room and fell asleep. He was awakened by the gunshot. He ran into the other room where he saw Flores laying down and Wirth standing with the gun at his feet.

## DISCUSSION

### I

*Admission of Hearsay Statement by Victim*

Pearch and Strawn contend the court erred in admitting as a spontaneous statement Flores's statement to his brother that he was being hurt.

Under Evidence Code section 1240:

"Evidence of a statement is not made inadmissible by the hearsay rule if the statement:

"(a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and

"(b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

" 'To render [statements] admissible [under the spontaneous declaration exception] it is required that (1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to

be yet in abeyance; and (3) the utterance must relate to the circumstances of the occurrence preceding it.' [Citations.]" (*People* v. *Poggi* (1988) 45 Cal.3d 306, 318 [246 Cal.Rptr. 886, 753 P.2d 1082], cert. den. 492 U.S. 925 [106 L.Ed.2d 606, 109 S.Ct. 3261].)

As used in Evidence Code section 1240, "spontaneous" is used in the sense of "to describe actions undertaken without deliberation or reflection." (*People* v. *Farmer* (1989) 47 Cal.3d 888, 903 [254 Cal.Rptr. 508, 765 P.2d 940], cert. den. 490 U.S. 1107 [104 L.Ed.2d 1021, 109 S.Ct. 3158].) "The crucial element in determining whether a declaration is sufficiently reliable to be admissible under this exception to the hearsay rule is . . . not the nature of the statement but the mental state of the speaker." (*Ibid.*) Ultimately, the decision whether to admit a statement as a spontaneous utterance lies within the discretion of the trial court. (*People* v. *Gallego* (1990) 52 Cal.3d 115, 175 [276 Cal.Rptr. 679, 802 P.2d 169]; *People* v. *Provencio* (1989) 210 Cal.App.3d 290, 302 [258 Cal.Rptr. 330].)

The trial court admitted the statement based on finding the phone call was staged at the direction of the defendants to make an inquiry for money from Flores's brother, with Flores "perhaps having been threatened, having been beaten, perhaps even having a gun held on him." The court believed the event Flores was describing when he said he had been hurt was not the kidnapping[1] or the shooting (which had not yet happened) but was "maybe holding him against his will, false imprisonment, or perhaps an assault with some sort of weapon, or perhaps assault with fists or something that left the marks on the face." The court believed Flores was not making his statement contemporaneously with the event; the court believed he had been hurt sometime before the telephone call.

These findings by the court indicate the court engaged in speculation as to: (1) what event Flores was describing; (2) when that event occurred; and (3) whether Flores was still under the effect of that event at the time of the phone call. Nothing in the record indicates Flores's statement was made at or shortly after he was hurt or that he was still under the influence of the harm inflicted. (Contrast *People* v. *Farmer, supra,* 47 Cal.3d 888; *People* v. *Jones* (1984) 155 Cal.App.3d 653 [202 Cal.Rptr. 289].) Nothing in the record suggests Flores did not have an opportunity to reflect in the interim between the time he was hurt and the time of the phone call. Nothing in the

---

[1] Despite the court's ruling, the Attorney General argues the "startling event" triggering Flores's statement was "[b]eing kidnapped in the middle of the night." The trial court clearly rejected this as the startling event, a rejection supported by evidence showing not only did the kidnapping in the middle of the night occur over 13 hours before the statement thus providing Flores with ample time for reflection but also Flores demonstrated his ability to fabricate in that interim: he told his mother he was with 2 voluptuous blonds.

record shows that Flores was in an excited state so that he was unable to reflect or deliberate at the time of his phone call.

The Attorney General argues *People* v. *Garcia* (1986) 178 Cal.App.3d 814 [224 Cal.Rptr. 198] supports admission of the statement here. In *Garcia*, the witness had telephoned the victim at the defendant's house. The victim answered the phone. He asked the witness to come pick him up at the defendant's house, stating the defendant had "gone crazy" and was going to shoot him. He asked the witness to bring a gun with her. In the background, the witness heard some angry yelling. The phone then went dead. (*Id.* at p. 819.) The court found "the statements were virtually the victim's last words before he was murdered" (*id.* at p. 821) and upheld admission of the victim's statements as a spontaneous declaration because it was "apparent that [the victim's] excited utterance was contemporaneous with the transaction which led to his death and while his reflective powers were still in abeyance." (*Ibid.*)

*Garcia* is similar to this case in that both cases involved telephone calls and homicides but otherwise we find (as did the trial court here) that *Garcia* is significantly different. In *Garcia*, the statements were made contemporaneously with the event. Here, as found by the trial court, the statements were not made contemporaneously with the event. In *Garcia*, it was also clear as to what event was causing the victim's excited state, clear that the victim was excited and clear that the victim had no time for reflection. Here, the court was unable to identify the event Flores was describing or when it occurred. Further, the evidence while indicating Flores may have been nervous, did not tend to show he was still under the influence of the event at the time of the phone call.

We conclude the court erred in admitting the victim's statements under the spontaneous declarations exception to the hearsay rule.

## II

### *State of Mind Exception*

Alternatively, the Attorney General argues the statement was admissible under the state of mind exception to the hearsay rule.

Under Evidence Code section 1250:

"[E]vidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible

by the hearsay rule when . . . [t]he evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or . . . is offered to prove or explain acts or conduct of the declarant."

■ The statement is not admissible if "made under circumstances such as to indicate its lack of trustworthiness." (Evid. Code, § 1252.) A declaration of a present existing state of mind made in a natural manner and not under circumstances of suspicion, carries the probability of trustworthiness. (*People* v. *Spencer* (1969) 71 Cal.2d 933, 947 [80 Cal.Rptr. 99, 458 P.2d 43]; *People* v. *Pinn* (1971) 17 Cal.App.3d 99, 106 [94 Cal.Rptr. 741].) This "section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed." (Evid. Code, § 1250, subd. (b).)

The trial court here did not admit the statement under the state of mind exception to the hearsay rule. In fact, the court specifically rejected admitting the statement "for a limited purpose, for example, to only relate to the declarant's state of mind." Thus, the court never ruled on the admissibility of the statement under the state of mind exception nor considered whether the statement was made under trustworthy circumstances.

■ Even assuming Flores's statement would be admissible under the state of mind exception as a statement of a physical sensation,[2] we believe it would be inappropriate to hold the statement was properly admitted here when the court did not exercise its discretion to admit or exclude the statement under the state of mind exception.

Under the state of mind exception, Flores's statement could be used to show Flores was feeling the effects of being hurt. The offense of kidnapping does not require the victim be physically hurt. Further, Flores could have been hurt by the defendants without any kidnapping having occurred, e.g., as the result of an argument or fight between Flores and the defendants about money or drugs or the Porsche. It is possible for the jury to infer from Flores's statement about being hurt that Flores was afraid of Wirth, Pearch and/or Strawn. While the victim's fear is not an element of the offense of kidnapping, the coerced movement of the victim through force or threats is an element. The jury could infer from Flores's fear that the defendants had

---

[2] We note Flores's statement that he had been hurt is a statement which tends to describe a past event rather than a state of mind or physical sensation. Flores, however, also told his brother he needed the money to avoid being hurt in the future. This second statement has more of a tendency to prove Flores's state of mind, i.e., that he was in a fearful state. The trial court excluded this second statement because it did not fit within the spontaneous declaration exception to the hearsay rule.

used physical harm and threats to coerce him. This coercion may have been used to kidnap Flores initially and to detain him at the hotel; it may have been used to force Flores to obtain money which Flores owed to some or all of the defendants.

Flores's hearsay statement is not direct evidence of the kidnapping but circumstantial evidence, which depends on a chain of inferences to reach the conclusion Flores was not with the defendants voluntarily but had been kidnapped. The inference Flores had been kidnapped was not the only one which could be drawn from the statement; even without being kidnapped Flores may have been hurt and may have had reasons to fear the defendants.

Admission of the statement under the state of mind exception would be only for a limited purpose, a factor which the trial court did not consider. Nor did the court consider the potential for juror confusion or prejudice to the defendants if the statement was admitted.

Further, Flores's statement he was being hurt does not appear to have been made under circumstances which indicate its trustworthiness. The purpose of the phone call was to obtain money, possibly relating to a drug transaction. The phone call was made in the presence of the others, using English for the benefit of others. The trial court believed the phone call was staged. The statement was not made in a natural manner and was made under suspicious circumstances. (Compare *People* v. *Pinn*, *supra*, 17 Cal.App.3d 99, 106.) On the record we cannot say as a matter of law that this was a trustworthy statement within the state of mind exception which should have been admitted into evidence.

## III

### *Prejudice*

When the court abuses its discretion in admitting hearsay statements, we will affirm the judgment unless it is reasonably probable a different result would have occurred had the statements been excluded. (*People* v. *Lynn* (1984) 159 Cal.App.3d 715, 734 [206 Cal.Rptr. 181].) Here, we reverse.

The prosecution's theory was that Flores was killed during a kidnapping. The key piece of evidence supporting this theory was Flores's statement to his brother about needing money and that he had been hurt. The prosecutor mentioned the statement in her opening argument. She implied the reason for the kidnapping and killing was perhaps "a drug-related thing" and

asked why Wirth, Pearch and Strawn wanted money from the victim. The prosecutor implied the victim was killed because he was unable to obtain money.

The prosecutor pursued this theory during her cross-examination of Strawn, asking him if he had hired Flores to collect $5,000 for him and if Strawn had then hired Pearch and Wirth to obtain the $5,000 from Flores.[3]

During final argument, the prosecutor again referred to the victim's statement. She argued:

". . . Victor Flores calls his brother and asks for $5,000, and an hour and 45 minutes later he's dead because his brother wouldn't give him the money. The phone's cut off. They're speaking in English. They can't get around that. That tells the whole story right there. Yes, the events that occur up to that time are clouded because none of us were in the room, but we do know that for sure, that he wanted the money from his brother, he couldn't get it, and an hour and 45 minutes later, the same guys that bought the gun kill him."

■ This was a close case on the issue of whether Flores voluntarily accompanied the defendants or was kidnapped. The evidence tending to show Flores was kidnapped was by no means overwhelming and was contradicted by other significant evidence. The evidence in support of the prosecution's theory, in addition to the evidence of Flores's statements, consisted primarily of the commotion at Flores's trailer at 3 a.m. the day he was killed and the quick departure by Flores and the others from the trailer. This evidence, while tending to show Flores might have been forced into leaving with the defendants was undercut by testimony of the police officer who investigated Flores's trailer after the killing. That officer found no signs of a struggle in the trailer.

---

[3] The prosecutor, during her cross-examination of Strawn, asked: (1) "[I]sn't it true that you hired Victor Flores to collect a $5,000 debt for you?" and (2) "Isn't it true that you hired Mr. Pearch and Mr. Wirth to get the money . . . from Mr. Flores?" Strawn answered no to both questions.

On appeal, Strawn contends the prosecutor committed misconduct by asking these questions because they were based on inadmissible testimony (Wirth's confession to the police). Strawn cites the rule stating it is improper for a prosecutor "to ask questions which clearly [suggest] the existence of facts which would have been harmful to defendant, in the absence of a good faith belief by the prosecutor that the questions would be answered in the affirmative, or with a belief on [her] part that the facts could be proved, and a purpose to prove them, if their existence should be denied." (*People* v. *Lo Cigno* (1961) 193 Cal.App.2d 360, 388 [14 Cal.Rptr. 354]; see also *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1098 [259 Cal.Rptr. 630, 774 P.2d 659], cert. den. __ U.S. __ [110 L.Ed.2d 651, 110 S.Ct. 2632].)

In light of our reversal of Strawn's conviction on other grounds, we need not reach the issue of prosecutorial misconduct. We note if the issue should arise on retrial the matter should be addressed *in limine* with the prosecutor required to demonstrate admissibility.

The evidence contradicting the kidnapping scenario was considerable. There was evidence Strawn knocked on the parents' front door and identified himself. Strawn said he was looking for Flores and asked if he could wait for him. Identifying himself to the parents is an act inconsistent with a planned kidnapping. There was evidence that at the Lexington Suites Hotel Flores stood alone out on the balcony and appeared normal and relaxed to other guests at the motel. There was Strawn's testimony Flores had left the motel by himself to get something to eat and drink and then returned by himself to the motel. There was evidence Flores had ingested a significant amount of cocaine and alcohol during that day. There was evidence that when Flores was killed he had a knife in his pocket, a fact inconsistent with a kidnapping where it would seem only natural the kidnappers would want to disarm their victim.

The closeness of the case is also indicated by juror questions. Just before the close of the evidence, there were numerous questions submitted by a juror about the events presented at trial. Later, during deliberations, the jury asked for a rereading of the testimony of five witnesses, including that of the victim's brother and Strawn. They also asked about the difference between kidnapping and being held against one's will, and about the locations of phone calls made from the Lexington Suites Hotel, indicating their concern about Flores's telephone calls and the kidnapping scenario. Juror questions and requests to have testimony reread are indications the deliberations were close. (See *Maupin* v. *Widling* (1987) 192 Cal.App.3d 568, 572-573 [237 Cal.Rptr. 521]; *People* v. *Fuentes* (1986) 183 Cal.App.3d 444, 456 [228 Cal.Rptr. 321, 237 Cal.Rptr. 465].)

Our review of the evidence, the argument and deliberations of the jury convince us the error in admitting Flores's statement was not harmless. The case was tried on a theory the killing occurred during a kidnapping and that was the basis of the jury's verdict. The centerpiece of the theory was Flores's phone call to his brother asking for money and telling him he had been hurt. We conclude it is reasonably probable a different result would have occurred had the statement not been admitted into evidence.

We address the remaining contentions for the guidance of the trial court in the event of a retrial.

### IV

*Simple Kidnapping as Basis for Second Degree Felony Murder*

■ Pearch and Strawn contend simple kidnapping is not a felony inherently dangerous to life and therefore cannot serve as the basis for second degree felony murder.

■ Second degree felony murder is defined as: "A homicide that is a direct causal result of the commission of a felony inherently dangerous to human life (other than the . . . felonies enumerated in Pen. Code, § 189) . . . ." (*People* v. *Ford* (1964) 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892], overruled on other grounds in *People* v. *Satchell* (1971) 6 Cal.3d 28 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383].) Whether a felony is inherently dangerous is determined by viewing the felony in the abstract, not by focusing on the particular facts of the case. (*People* v. *Patterson* (1989) 49 Cal.3d 615, 621 [262 Cal.Rptr. 195, 778 P.2d 549].) In *People* v. *Burroughs* (1984) 35 Cal.3d 824, 833 [201 Cal Rptr. 319, 678 P.2d 894], the Supreme Court described an inherently dangerous felony as one which "cannot be committed without creating a substantial risk that someone will be killed." Subsequently, in *People* v. *Patterson, supra,* 49 Cal.3d 615, 627, the Supreme Court adopted a new standard holding an inherently dangerous felony "is an offense carrying 'a high probability' that death will result."[4]

■ Pearch and Strawn argue kidnapping is not inherently dangerous by relying on the Supreme Court's rejection of false imprisonment as an inherently dangerous felony. They argue simple kidnapping must not be inherently dangerous to human life because kidnapping is merely a false imprisonment with movement and movement, itself, is not dangerous.

In *People* v. *Henderson* (1977) 19 Cal.3d 86 [137 Cal.Rptr. 1, 560 P.2d 1180], the Supreme Court, in determining whether false imprisonment was an inherently dangerous felony, first looked to the elements of the offense as defined in the Penal Code which provided false imprisonment was "the unlawful violation of the personal liberty of another" and was a felony if accomplished by "violence, menace, fraud, or deceit." (Pen. Code, §§ 236, 237.) The Supreme Court viewed "the primary element of the offense" as "the unlawful restraint of another's liberty," which did "not necessarily involve the requisite danger to human life." (*People* v. *Henderson, supra,* 19 Cal.3d at p. 93.) The Supreme Court explained:

"The aspect of confinement is not life threatening. It has been said that '[a]ll that is necessary to make out a charge of false imprisonment is that the individual be restrained of his liberty without any sufficient complaint or authority therefor . . . . Temporary detention is sufficient, and the use of

---

[4] *People* v. *Patterson, supra,* 49 Cal.3d 615, was decided on September 7, 1989, while the appeal in this case was pending. Pursuant to the normal rules of retroactivity (see *People* v. *Guerra* (1984) 37 Cal.3d 385, 399-402 [208 Cal.Rptr. 162, 690 P.2d 635]), *Patterson* would apply to this case. However, we need not decide this issue since, whether considered under the *Patterson* or the *Burroughs* standard, we conclude kidnapping is an inherently dangerous felony which will support a conviction of second degree felony murder.

actual physical force is not necessary.' [Citation.] The unlawful conduct by which the confinement is accomplished also does not necessarily involve a hazard to the victim's life. ' "The wrong may be committed by acts or by words, or both, and by merely operating upon the will of the individual or by personal violence, or both. . ." ' [Citation.] The conduct may involve merely the simple act of announcing without probable cause the making of a citizen's arrest, the natural consequence of which is to cause the police to take the victim into custody. [Citation.]" *(Id.* at pp. 93-94.)

The Supreme Court then considered whether the factors which elevated the offense to a felony made the crime inherently dangerous to human life. The court concluded:

"It is manifest that the four factors of violence, menace, fraud, or deceit do not all involve conduct which is life endangering. Quite obviously fraud or deceit portend no such danger; certainly one who commits felony false imprisonment by means of fraud or deceit presents no danger significantly greater than one who commits misdemeanor false imprisonment so as to justify imputing malice to the former but not to the latter should a homicide result. [Citation.]" *(People v. Henderson, supra,* 19 Cal.3d at p. 94.)

In *Henderson,* the Attorney General urged the court not to analyze the offense of felony false imprisonment as a whole, but to look to which "type of felony false imprisonment is involved in the particular case," i.e., whether the felony false imprisonment is one involving violence or menace (which would be sufficient to support a second degree felony murder conviction) or is one involving fraud or deceit (which would not be sufficient to support a second degree felony murder conviction). (19 Cal.3d at p. 95.) The Supreme Court rejected the argument, insisting the felony false imprisonment statute be viewed as a whole.[5]

In contrast to false imprisonment, the crime of kidnapping requires the use of either physical force or a threat of harm to accomplish the crime. (Pen. Code, § 207.) Thus, unlike false imprisonment, the crime of kidnapping is fraught with violence—either the actual use of physical force or the threat of physical harm. " '[F]orcible removal' of one person by another . . . constitutes the essence of kidnaping [citations] . . . ." *(People v. Salazar* (1980) 108 Cal.App.3d 992, 999 [167 Cal.Rptr. 38].)

---

[5]The Supreme Court has subsequently, in *People v. Patterson, supra,* 49 Cal.3d 615, explained if a felony statute proscribes an "essentially single form of conduct" then the court must examine the statute as a whole when determining inherent dangerousness but if the statute lacks "a primary element" and includes "a variety of offenses," then the court may sever the proscribed conduct when determining inherent dangerousness. *(Id.* at pp. 623-625.)

The use of physical force against another individual is always dangerous and presents extreme risks in the circumstances of a kidnap where the kidnapper must apply force not only to overcome the victim's resistance but also to move that victim a substantial distance; such force, by its nature is dangerous and life threatening.

A kidnapping accomplished by threats of harm or injury which the victim reasonably feels compelled to obey under the circumstances is also extremely dangerous. In order to compel the victim to comply, the kidnapper must make a serious threat of real harm, i.e., death or significant injury, and make the victim believe the threat is real, e.g., by displaying or alluding to a gun or a knife or other similar weapon. Idle threats of harm which are not reasonably believable under the circumstances are not sufficient. Threats of serious harm or death made with a show of willingness to carry through on those threats present an inherently dangerous situation.

We further observe kidnapping is one of the few crimes our courts have consistently found to be a crime inherently dangerous and sufficient to support a felony murder conviction. (See *People v. Burroughs, supra*, 35 Cal.3d 824, 832, where the court included kidnapping as a crime "tinged with malevolence" in a list of crimes supporting second degree felony murder; *People v. Ford* (1966) 65 Cal.2d 41, 58 [36 Cal.Rptr. 620, 388 P.2d 892], overruled on other grounds in *People v. Satchell* (1971) 6 Cal.3d 28 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383]; *People v. Ordonez* (1991) 226 Cal.App.3d 1207 [277 Cal.Rptr. 382]; *People v. Kelso* (1976) 64 Cal.App.3d 538, 541 [134 Cal.Rptr. 364]; *People v. Romo* (1975) 47 Cal.App.3d 976, 989 [121 Cal.Rptr. 684], disapproved on other grounds in *People v. Bolton* (1979) 23 Cal.3d 208 [152 Cal.Rptr. 141, 589 P.2d 396] and *People v. Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306].)

Most recently, the court in *People v. Ordonez, supra*, 226 Cal.App.3d 1207, a case holding killing during a kidnapping for ransom, extortion or reward was second degree felony murder, noted:

"Kidnapping has been proscribed since biblical times: 'And he that stealeth a man, and selleth him, or if he be found in his hand, he shall surely be put to death.' (Exodus 21:16.) Blackstone recognized the ancient origins of the crime: '[K]idnapping, being the forcible abduction or stealing away of man, woman or child from their own country, and selling them into another, was capital by the Jewish law . . . . So likewise, in the civil law, the offense of spiriting away and stealing men and children; which was called plagium and the offenders plagiarii, was punished with death. This is unquestionably a very heinous crime, as it robs the king of his subjects,

banishes a man from his country, and may in its consequences be productive of the most cruel and disagreeable hardships; and therefore the common law of England has punished it with fine, imprisonment and pillory.' (4 Blackstone, Commentaries 219.)" (226 Cal.App.3d at p. 1225, fn. 7.)

We conclude simple kidnapping is an inherently dangerous felony which may support a conviction of second degree felony murder.

## V

### *Sua Sponte Instructions on When Kidnapping Ends*

Pearch and Strawn contend the court erred in failing to sua sponte instruct the jury on when a kidnapping ends.

■ The trial court has a duty to instruct the jury on principles of law which are closely and openly connected with the evidence and which are necessary to the jury's understanding of the case. (*People* v. *Kimble* (1988) 44 Cal.3d 480, 503 [244 Cal.Rptr. 148, 749 P.2d 803], cert. den. 488 U.S. 871 [102 L.Ed.2d 157, 109 S.Ct. 188].) The trial court must instruct on a particular defense and its relevance to the charged offense if it appears the defendant is relying on the defense or if there is substantial evidence to support the defense and the defense is not inconsistent with the defendant's theory of the case. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913], overruled on other grounds in *People* v. *Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1].) Regardless of a request for specific instructions, the trial court must act as a neutral arbiter between the contesting parties to guide the jury on the law. (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 323 [185 Cal.Rptr. 436, 650 P.2d 311].) As the Supreme Court has explained:

"The fulfillment of this obligation ensures that the jury will consider the full range of possible verdicts—not limited by the strategy, ignorance, or mistakes of the parties. The jury should not be constrained by the fact that the prosecution and defense have chosen to focus on certain theories." (32 Cal.3d at p. 324.)

In the event of a retrial, Pearch and Strawn can, of course, request the court to instruct the jury on their theory the kidnapping (if it had occurred) had ended before Flores was killed. ■ Even if Pearch and Strawn do not affirmatively request such an instruction, the court should instruct on when a kidnapping ends if Pearch and Strawn rely on a defense that even if Flores had been kidnapped from his trailer initially, the kidnapping had ended before he was killed.

## DISPOSITION

The judgment is reversed. The cause may be retried on a theory of second degree felony murder and any included offenses.

Wiener, J., and Work, J., concurred.

A petition for a rehearing was denied May 21, 1991.