Filed 8/29/14  P. v. Adams CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CERVIS ERNEST ADAMS,<br><br>        Defendant and Appellant. | A136639<br><br>(Contra Costa County<br>Super. Ct. No. 5-101475-2) |

Cervis Ernest Adams appeals from a judgment upon a jury verdict finding him guilty of forcible sexual penetration (Pen. Code,[1] § 289, subd. (a)(1)) and inflicting corporal injury upon a cohabitant (§ 273.5, subd. (a)).  Defendant pled guilty to failing to register as a sex offender within five days of gaining residency (§ 290.011, subd. (b)), and failing to register as a sex offender within five days of changing residency (§ 290, subd. (b)).  In a bifurcated proceeding, the trial court found true the allegations that defendant had previously been convicted of sexual penetration with a foreign object using force (§ 667.61, subds. (a) & (d)), and that he had sustained four prior "strike" convictions (§§ 667, subds. (b)–(i), 1170.12), one prior serious felony conviction (§ 667, subd. (a)(1), and one prison prior (§ 667.5, subd. (b)).  Defendant contends that the trial court abused its discretion in admitting evidence of his prior sex offense.  We affirm.

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

1

# I. FACTS

E.E. began dating defendant in July 2010. E.E. attended church with defendant on July 25, 2010, and he escorted her home and spent the night with her in her apartment in Richmond. He spent several nights at her home; they performed oral sex on each other and defendant inserted his fingers in E.E.'s anus. The relationship continued for about three weeks during which they continued to engage in oral sex, with defendant inserting his fingers in E.E.'s anus about 10 times. On one of those occasions, defendant inserted a dildo into her anus. E.E. never told defendant to stop, but she did tell him that he was hurting her.

At approximately 2:00 a.m. on August 6, 2010, E.E. awoke to defendant orally copulating her. She was startled. She told him to stop because he was not doing it right. Defendant punched E.E. in the face and slapped both sides of her face with his open hand. Her lip was injured and one of her teeth became loose. A photograph of the injured lip was shown to the jury. E.E. did not call the police because she knew that defendant kept a Ka-Bar, a big knife, under his pillow. Defendant seemed to know a number of policemen and she did not think they would help her. She did not end the relationship with defendant because he "sweet talk[ed]" her.

At 2:00 a.m. on August 7, 2010, E.E. awoke to defendant inserting his fingers into her vagina. They went back to sleep and got up at 4:00 a.m. because defendant had to attend a funeral in San Francisco. As they went to the living room, defendant told her, "tonight I'm going to . . . fuck you up in your butt, so get ready." In the living room, defendant said, "hit it," meaning to orally copulate him. E.E. orally copulated defendant. They then read the Bible. E.E. reminded defendant that he needed to leave for the funeral.

Defendant went to the front door and told E.E., "Come here." E.E. went to defendant, who kneeled down and pulled down her pajama pants. He took her right leg and placed it over his left shoulder and started to orally copulate her. E.E. told him to stop because he was doing it wrong. He grabbed her by the shoulders and twisted and slammed her to the ground. Due to the force defendant used, E.E. landed on her back.

2

He straddled her, moved her legs over her shoulders, and inserted his finger in her anus. E.E. yelled at him to stop at least four times. She tried to get away and to cover her buttocks with her hand. Defendant also tried to strangle her throat as she yelled for help.

While E.E. struggled with defendant, she heard a knock on the door. E.E. yelled for help. Defendant said, "you have the Mexican Army on me, baby." He told her to be quiet. Defendant left the apartment shortly thereafter and was apprehended by the police who had responded to the scene. The parties stipulated that there were two 911 calls; the first call was at 7:43 a.m. and the second one was at 7:44 a.m.

Ana Maria Solorczono testified that E.E. was her neighbor and lived in the apartment located above her unit. She testified that she recalled the day the police came to her apartment. She testified that she was asleep when she heard a noise like something being thrown. She was frightened by the noise, but went back to sleep. When she woke up at about 7:00 a.m., she heard E.E. crying and saying, "help me," "stop," and "leave me alone." She continued to hear noises and E.E. crying, so she grabbed a broom and hit the ceiling with it. When the noises did not stop, she went to E.E.'s apartment and knocked on the door. E.E. asked, "Who is it?" Solorczono said, "Ana" to which E.E. replied, "Ana, help me." Solorczono tried to open the apartment door but it was locked. She fled to her apartment because she feared that defendant would come out. She continued to hear E.E. and then it was quiet. Fearing something had happened to E.E., Solorczono called the police. A recording of Solorczono's 911 call was played for the jury.

Summer Parker testified that she lived in the apartment next door to E.E.'s apartment. She testified that on the day of the incident, her son woke her up and told her to call 911 because the lady next door needed help. Parker heard E.E. screaming for help. Parker called 911. The prosecutor read a transcript of the call to the jury in which Parker reports that E.E. is screaming.

Officer Robert Aiavao responded to the scene. Defendant told Aiavao that he had inserted his finger in E.E.'s anus. Defendant said, "Man, we were fucking around. We've been sucking and fucking for the last two weeks. She's my girlfriend. This morning we were fucking around, and I stuck my finger in her ass. She started

3

screaming. She's always screaming. She's crazy, man. Just ask the neighbors. She'll just start screaming for no reason[]."

Officer Rebekah Ireland-Clark testified that she read defendant his *Miranda*[2] rights and interviewed him about 6:30 p.m. on the day of the incident. Defendant told her that he inserted his fingers in E.E.'s vagina and anus that morning.

Officer Ian Reid spoke with E.E. at about 9:00 a.m. on the morning of the incident. He observed injuries to her inner and lower lip. E.E. told Reid that defendant had struck her with a closed fist and slapped her a couple of times on August 5. She told Reid that defendant had orally copulated her on the morning of August 7, that she did not want him to do it, but that she decided to let him do it so that he would then leave. However, she became uncomfortable because her legs were weak and asked defendant to stop. Defendant, however, inserted his fingers in her vagina. E.E. said no, and then stop, and covered her anus with her hand. E.E. continued to say, "stop," and called for help. Defendant inserted his fingers in her anus.

Ireland-Clark interviewed E.E. later that day. E.E. was very upset and crying. E.E. told Ireland-Clark that defendant had a fixation with touching her anus and that he had done so about 10 times. Defendant used his fingers, and on one occasion, he used a dildo. E.E. said that defendant's fingernails were always jagged, long, and dirty and that it hurt her when he touched her. E.E. told Ireland-Clark that she initially consented to sex with defendant but later she engaged in sex with him because she feared him and his Ka-bar knife. E.E. told Ireland Clark that she told defendant that morning to stop when he inserted his fingers in her vagina because it hurt. She also screamed for help. She feared that he was going to penetrate her anus, and told him to stop. She tried to unlock the door but defendant reached toward the door and slammed it shut. Ireland-Clark saw the cut on E.E.'s lip.

Ima Mathis testified that she was married to defendant in June 1988. On October 30, 1988, around midnight, defendant woke Mathis up and told her he wanted to have

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

4

anal sex. Mathis told him no. Defendant became upset. He told her that she was his wife and that she did not have the right to refuse him. He grabbed her by the hair, threw her out of bed onto the floor, and handcuffed her. He forcibly put a douche bag in her vagina, and a broomstick in her rectum. He told her that she was unclean and needed to be washed. He said that she had the devil in her, and that someone was using her to get him. He continued to hit her, to pour hot water over her head, and to pump the broomstick in her rectum. She screamed, but no one came to her aid. He continued to assault her until daylight. He then took the handcuffs off and told her to get ready for work. Mathis was so weak and in so much pain that she could hardly get up off the floor. Defendant eventually took her to the hospital.

In defense, defendant testified that E.E. consented to oral sex with him and permitted him to insert his fingers in her vagina and anus. He testified that E.E.'s lip was scratched when he tapped her on the top of the lip to calm her down because she woke up in the middle of the night screaming on August 3. On August 7, he and E.E. read the Bible in the morning at approximately 4:30 a.m. At about 5:15 a.m., E.E. orally copulated defendant for about 40 minutes. He did not ask her to do it or force her. E.E. then reminded him that he had a funeral to attend, so he got dressed. Defendant was getting ready to leave, but he decided to orally copulate E.E. by the kitchen doorway. E.E. stood against the wall while he performed oral sex on her. E.E. complained about his performance, so he grabbed her waist and laid her down on the floor near the front door. E.E. screamed, and the downstairs neighbor hit the ceiling of her apartment with a broom or something. E.E. screamed a second time and the neighbor came to the front door and knocked. E.E. never told him to stop. But defendant acknowledged that E.E. screamed and yelled when the neighbor was at the door. E.E. did not say anything to the neighbor and did not try to leave the apartment. He denied engaging in any other sexual acts with her on the floor.

Defendant admitted that he previously had placed his fingers in E.E.'s vagina and rectum as that is something that he has always done when he has sex with a woman. He

5

also admitted that he inserted a stick in Mathis's anus. He explained that he had a mental break down, was hearing voices in 1988, and believed that Mathis was evil.

## II. DISCUSSION

Defendant contends that the admission of evidence of defendant's prior sex offense against Mathis pursuant to Evidence Code section 1108 to prove his propensity for sex offenses violated his due process rights.

Evidence of a prior sexual offense is admissible in a prosecution for another sexual offense to prove propensity. (Evid. Code, § 1108, subd. (a).) The statute, which allows the admission of propensity evidence in sex offense cases, is intended to relax the requirements of Evidence Code section 1101 for admission of evidence to prove a character trait. (*People v. Falsetta* (1999) 21 Cal.4th 903, 911 (*Falsetta*).) Although Evidence Code section 1108 expands the admissibility of such evidence, admission remains subject to exclusion under Evidence Code section 352. (*Id.* at pp. 916–917.) We review the court's ruling under section 1108 for abuse of discretion. (*People v. Loy* (2011) 52 Cal.4th 46, 61.)

The trial court ruled that evidence of the prior sex offense was admissible under Evidence Code section 1108, finding that the nature of the prior offense was similar to the present offense in that the defendant asked for anal sex and the victim refused and was assaulted. Both the victim in the prior case and in the present one were involved in a domestic relationship, they were both at home, and both had a foreign object inserted in their rectums. The court further found that the present offense was not too remote in that defendant was released from prison just three years before the present offenses. While the prior offense involved great violence to the victim, the court limited the admission of testimony concerning the prior victim's injuries. The court ruled that the jury would not learn of the prior victim's medical history, injuries, or treatment.

In *Falsetta*, the court explained that in exercising its discretion under Evidence Code section 352, the court "must consider such factors as [the] nature [of the sex offense], relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main

6

inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta*, *supra*, 21 Cal.4th at p. 917, see also *People v. Harris* (1998) 60 Cal.App.4th 727, 737–741.)

Applying those factors here, and considering all of the circumstances, we conclude that the trial court did not abuse its discretion in admitting evidence of the prior sex offense. The facts of the previous offense, though more violent than the offense here, were similar in that in both instances, defendant forced the victims to the floor following an argument about sex, penetrated them in the rectum, and choked them. And both offenses occurred in the early morning hours and both victims were involved in a domestic relationship with the defendant.

Defendant argues that the prior offense was too remote in time because it occurred 23 years prior to the present charged offenses. But defendant was in prison for much of that time, and the charged offenses occurred just three years after his release from prison. The lapse of time between the offenses, therefore, provided no reason to exclude evidence of the prior offense. (*People v. Loy*, *supra*, 52 Cal.4th at p. 62 [charged offenses not remote when defendant who had been in prison had little or no opportunity to commit sexual crimes]; *People v. Pierce* (2002) 104 Cal.App.4th 893, 900 [rape committed 23 years ago not too remote to charged offense when defendant had been incarcerated for at least 12 years after the rape].)

Defendant also argues that any probative value of the propensity evidence was outweighed by the undue prejudice resulting from the aggravated conduct of the prior offense. We are not persuaded. The evidence of the prior offense did show a significantly more severe offense, but there were similarities between the offenses and defendant admitted to the police that he had inserted his fingers in E.E.'s rectum. It is unlikely that the jury was misled, confused, or distracted from their task of determining whether the charged offenses were proven.

Moreover, this is not a case where the jury would have concluded that defendant was not convicted of the prior offense and therefore would have been inclined to punish him by convicting him of the charged offenses. (*People v. Harris*, *supra*, 60 Cal.App.4th at p. 738.) In *Harris,* the jury was told the facts of an aggravated rape but the parties stipulated that the accused had been convicted of first degree burglary with the infliction of great bodily injury, and thus the jury was left with the impression that the defendant escaped a rape charge. (*Id.* at pp. 734–735.) Here, however, defendant testified that he was a sex offender and alluded to the fact that he had been in prison until 2007. Hence, the jury would not have convicted him of the charged offenses based on the notion that he had eluded punishment for the prior offense.

Defendant further contends that the court made factual errors in determining that the prior offense was similar to the present one. He cites the court's finding that both incidents involved claims of infidelity. We agree that this finding is not borne out in the record. Nevertheless, the offenses bore significant similarities militating in favor of admission of the prior offense; we cannot conclude that the court abused its discretion in admitting the evidence.

Even if the court erred in admitting evidence of the prior offense, the error was harmless. Defendant admitted to both officers who responded to the scene that he had inserted his fingers in E.E.'s anus. And, the prosecution evidence was strong that defendant committed the offense. In addition to E.E., who testified that defendant assaulted her, two neighbors corroborated her distress during the incident and her screams for help.

Defendant's reliance on *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378, 1384 is misplaced. *McKinney* involved the admission of prior uncharged misconduct against a defendant to show propensity. The court held that the evidence of other acts was irrelevant and that its admission violated due process. (*Id.* at pp. 1384–1386.) Our Supreme Court distinguished *McKinney* in *Falsetta*, stating that it predated Evidence Code section 1108 and applicable federal rules regarding similar crimes evidence and that it did not involve evidence of another crime, but concerned pure propensity evidence.

8

(*Falsetta, supra,* 21 Cal.4th at pp. 921–922.) California courts have rejected *McKinney*. (See *People v. Fitch* (1997) 55 Cal.App.4th 172, 178–182; *People v. Callahan* (1999) 74 Cal.App.4th 356, 365.) " '[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules.' [Citation.]" (*Callahan, supra,* at p. 365.)

Finally, defendant asserts that the length of the jury's deliberations demonstrates that the case was close and that the admission of the inflammatory prior offense was prejudicial. He notes that the jury deliberated a total of over eight hours, asked several questions, requested a read back of testimony concerning E.E.'s statements to Officer Reid, and at one point indicated that it was "hung 7-5 on Count 1 and having difficulty making additional headway." While we agree that these factors suggested a close case (see *People v. Collins* (1968) 68 Cal.2d 319, 332 [jury deliberations of approximately eight hours indicated the closeness of case]; *People v. Pearch* (1991) 229 Cal.App.3d 1282, 1295 [juror questions and requests to have testimony reread are indications the deliberations were close]), given the strength of the prosecution's case, we cannot conclude that it is reasonably probable a different result would have occurred had evidence of the prior offense not been admitted.

### III.  DISPOSITION

The judgment is affirmed.

9

_____

Rivera, J.

We concur:

_____

Ruvolo, P.J.

_____

Reardon, J.