Filed 9/10/20  P. v. Aguilar CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>JESSE AGUILAR,<br><br>     Defendant and Appellant. | F076890<br><br>(Super. Ct. No. F14902005)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Houry A. Sanderson, Judge.

Cliff Gardner, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Jesse Aguilar was convicted following a jury trial of first degree murder of Fernando Zapata Sr. (Zapata Sr.) (Pen. Code,[1] § 187, subd. (a); count 1); attempted murder of Fernando Zapata Jr. (Zapata Jr.) (§§ 664/187, subd. (a); count 2); and possession of a firearm by a felon (§ 29800, subd. (a)(1); count 3). As to count 1, the jury found true the special circumstance that appellant committed the murder while he was an active participant in a criminal street gang, and the murder was carried out to further the activities of the criminal street gang (§ 190.2, subd. (a)(22)). As to counts 1 and 2, the jury found true appellant had intentionally discharged a firearm in the commission of the offenses (§ 12022.53, subd. (d)) and had committed the crime for the benefit of, and in furtherance of, activities of a criminal street gang (§ 186.22, subd. (b)(4)(B)).[2] As to count 2, the jury found true that appellant had personally inflicted great bodily injury upon Zapata Jr. (§ 12022.7, subd. (a)). Appellant admitted to suffering two strike prior convictions (§§ 667, subds. (a)(1), (b)-(i) & 1170.12, subds. (a)-(d)) and two prior prison terms (§ 667.5, subd. (b)).

As to count 1, the court sentenced appellant to a prison term of life without the possibility of parole, plus a term of 25 years to life pursuant to section 12022.53, subdivision (d), and a determinate term of 10 years (five years for each prior) pursuant to

---

[1]    All further undesignated statutory references are to the Penal Code.

[2]    Section 186.22, subdivision (b)(4)(B) is a gang enhancement regarding the mandated minimum eligibility for parole that applies to home invasion robbery, carjacking, shooting at an inhabited dwelling, and offenses involving discharge of a firearm from a motor vehicle. The probation report pointed out the provision did not seem to apply to appellant's case. At appellant's sentencing, the court addressed the probation report's comment, stating: "There is some notations … as to … what the probation officer believes that an inaccurate section was used. Frankly, however, my reading of it is that would affect a possible mandated minimum eligibility for parole in Counts One and Two. It does not add time, necessarily. And so, I don't believe that would be a concern at this time that the Court has to address. [¶] … And I'm not passing any rulings on the inaccuracy of that section." The court did not sentence appellant to any additional time under section 186.22, and the parties do not mention this on appeal.

section 667, subdivision (a)(1). As to count 2, the court sentenced appellant to a term of life with the possibility of parole, plus a term of 25 years to life pursuant to section 12022.53, subdivision (d), and a determinate term of 10 years (five years for each prior) pursuant to section 667, subdivision (a)(1). The court imposed and stayed a three-year term for the great bodily injury enhancement pursuant to section 12022.7, subdivision (a). The court struck punishment for the 667.5, subdivision (b) offense because they arose from the same felonies alleged pursuant to section 667, subdivision (a). As to count 3, the court sentenced appellant to the aggravated term of three years, doubled to six years due to appellant's strike prior, to be served concurrently. Appellant's total prison term is a determinate term of 20 years, followed by two indeterminate terms of 25 years to life, an indeterminate term of life with the possibility of parole, and an indeterminate term of life without the possibility of parole.

On appeal, appellant contends (1) the court reversibly erred by allowing a law enforcement officer to testify to hearsay contents of wiretap conversations in violation of *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*); (2) the court interfered with appellant's right to the effective assistance of counsel by instructing the jury that they had "heard eyewitness testimony identifying the defendant"; and (3) the matter must be remanded for resentencing to allow the trial court to exercise its discretion under Senate Bill Nos. 620 (2017-2018 Reg. Sess.) and 1393 (2017-2018 Reg. Sess.). We affirm.

## FACTS[3]

Hermilo Cordero lived in a detached garage which had been converted into an apartment and faced an alley. On December 31, 2013, Cordero hosted a New Year's Eve party at his residence. Appellant attended the party, along with 10-15 other people. Half of the attendees, including appellant, stayed until the next day.

---

[3]    Our recitation of the facts excludes facts not relevant to this appeal.

Appellant is a member of the Calwa Varrio Locos gang also known as CVL or Calwa. Appellant's monikers are Payaso, Paya, and Big P. The CVL gang is a subset of the Bulldog gang. The parties stipulated at trial that CVL was a criminal street gang.

On January 1, 2014, Zapata Sr. and Zapata Jr. went to Cordero's residence to buy drugs. The Zapatas identified as members of the Bond Street Bulldogs. Zapata Jr. had the moniker "Baby" or "Baby Zap." Zapata Sr. went by "Zap." There had been issues between CVL and Bond Street Bulldogs in the past.

Surveillance footage of the property where the party took place showed that at 12:38:22[4] on January 1, 2014, a van driven by Maria Rodriguez, Zapata Sr.'s niece, pulled into the alley facing the converted garage. At 12:38:30, the Zapatas got out of the van and entered through a gate toward the apartment. At 12:38:45, a security door which led into the apartment "fl[ew] open." At 12:38:47, the surveillance video shows birds flying away from a wire. Several people ran out of the detached garage through the security door. When the door was closed, Zapata Sr. could be seen laying on the ground next to the apartment. At 12:38:50, the van quickly started to drive down the alley. The video showed appellant chasing after the van holding a semiautomatic firearm and then turning around to walk away putting the firearm into his waistband. At 12:40:15, Zapata Jr. walked away from the scene. The surveillance footage did not show the actual shooting, as it appears the security door obscured the view of the shooting.

Cordero testified he was asleep when the shooting took place and was wakened just after the shooting. Cordero and a female then ran out the door and entered a car driven by another female who had been at the party, with appellant already inside. They did not discuss what had just happened.

---

**4** The time references are to the 24-hour time stamp on the video. It was explained at trial the time stamp was 55 minutes fast.

A resident of the primary residence on the property where Cordero lived testified that she was cleaning outside her house when the shooting took place. She heard the gun shots but assumed they were part of a New Year's celebration. Because her dog was sitting and barking toward the back of the house, however, she went to see what was going on, and saw Zapata Sr. laying on the ground. She then saw Cordero and a female run past her and get into a car that was sitting in the middle of the street "like a getaway car." The witness instructed her niece to call the police, and an ambulance arrived.

Zapata Sr. was taken to the hospital and later died from a gunshot wound to his abdomen. The medical examiner who performed his autopsy determined the manner of death was homicide. Police contacted Zapata Jr. at a nearby mini-mart in response to a call by the store clerk reporting that a shooting victim was at the store. Zapata Jr. was taken to the hospital for treatment of a gunshot wound. Zapata Jr. suffered multiple rib fractures and a collapsed lung. Zapata Jr. was not cooperative with police and could not be located for trial.

Rodriguez testified that on January 1, she was giving the Zapatas a ride to buy drugs and was planning to drop them off. Rodriguez drove into the alley near Cordero's residence, and the Zapatas exited the vehicle; she had not even put the car in park when she heard two to three gunshots. Rodriguez did not think much of it because shooting firearms on New Year's was common. Then her son, who was in the vehicle with her, started screaming for "Zap," and she looked up and saw the Zapatas on the ground.

Rodriguez testified she saw a "guy in black clothes with a thing on his face and a gun in his hand" running toward her car. Rodriguez sped away because he had a gun in his hand, and she thought she might get shot. Rodriguez testified the gun looked like a revolver. Rodriguez was confronted with the surveillance footage at trial showing the man running toward her vehicle did not have his face covered but insisted she remembered he had something over his face. Rodriguez testified she did not know

5.

appellant, but knew of him because she went to high school with his brother's girlfriend and knows he is from Calwa and a member of the Calwa Bulldogs.

Sergeant Rafael Villalvazo testified that Rodriguez called the police twice soon after the shooting to say she had information about it and that he spoke to Rodriguez on January 3, 2014. When Rodriguez met with Villalvazo, she saw a recorder in Villalvazo's hand and told him she would not provide a statement if it were recorded. Rodriguez told Villalvazo she was scared for her life because the shooter knew and saw her. Villalvazo agreed not to record the statement. Villalvazo testified that Rodriguez told him she saw the shooting and that appellant was the shooter as well as the individual who had chased after her van. Rodriguez explained she had known appellant for 15 years and referred to him as "Jesse," "Paya," and "Jesse Aguilar." After Rodriguez told Villalvazo what happened, he showed her the surveillance video and she identified appellant as the person running after her van. Villalvazo showed Rodriguez a photograph of appellant, and she confirmed that he was the shooter. Rodriguez told Villalvazo that appellant had a silver firearm.

Appellant was arrested in late February 2014.

At trial, Rodriguez testified she spoke to Villalvazo a couple of days after the incident but did not tell Villalvazo that she saw the shooter. Rodriguez testified at the time of the incident, she did not even know appellant's name and did not recognize the person shown to her in the surveillance footage. Rodriguez testified "[appellant's] name never left my mouth." On cross-examination, defense counsel asked Rodriguez, "[Y]our testimony here today this morning is it wasn't [appellant], it was not him. Is that [what] you're saying?" Rodriguez said, "I'm saying, no, that was not him."

When the prosecutor asked Rodriguez if she was afraid of appellant, she responded, "I don't know him directly to be afraid of him, so." When the prosecutor asked Rodriguez if she was afraid of what would happen if she testified against appellant, she said, "I can't testify against him because I didn't see him there, and I didn't see the

6.

person that did this. They had a mask on their face." She testified, however, that she would be afraid to testify against anyone especially if they were a member of a gang.

California Highway Patrol Officer Ryan Yetter testified at trial. Yetter was a member of the Multi-Agency Gang Enforcement Consortium (MAGEC) and part of the FBI Safe Streets task force and gang task force, which meant he was cross-designated as a federal agent. At the time of his testimony, Yetter had been a member of MAGEC for about four years and had extensive gang training due to this membership.

In 2016, Yetter was one of the chief investigating officers on a number of crimes involving the Calwa street gang. In the course of his investigation, he obtained a court order authorizing the interception of cell phones and Facebook accounts for specified gang members. As a result, Yetter intercepted phone calls of CVL gang members Pete Romero aka "Peanut" and Gabriel Cortez aka "Black."

Yetter testified that through the wiretaps, he determined that a gang member from another Bulldog subset that went by the moniker of "Gangster" was being contracted to kill Zapata Jr. or "Baby." Yetter testified there were two calls between Peanut and Black where they talked about needing to get a "heater" or a gun to take care of Zapata Jr. They accurately described where Zapata Jr. lived. They discussed what times they thought he would be there and what roads they should take to find and kill him.

Yetter also intercepted calls involving appellant. Yetter described a specific call where another CVL gang member told appellant that "Gangster" was in the hood trying to take care of what he was supposed to take care of, and appellant said, "Good. Good. Keep him out there doing his thing."

Yetter described another call between Peanut and Black where they said it was shameful that CVL was not willing to kill Baby on behalf of appellant and that it was embarrassing for the gang and they needed to step up and do it. They need to get a gun and just do it and that appellant would be disappointed in them and disown them if they did not do it themselves.

7.

On April 13, 2017, a traffic stop was conducted on a vehicle without a rear license plate. The vehicle tried to evade the police and when the vehicle eventually pulled over, the passenger ran from the vehicle. The rear passenger of the vehicle was carrying a paper in his right front pocket that was later identified as a "kite." Yetter defined a "kite" as a note that is written in very small handwriting and designed to be passed around jail or eventually out of jail.

The kite seized from the passenger of the vehicle was admitted into evidence. Yetter testified he believed the kite was written by appellant and based this opinion on several factors. First, the kite was signed by "Papa. Big P Funk. Calwa Varrio Locos." Yetter testified that appellant goes by Payaso and several variations of that: Paya, Big P, and Big P Funk. Yetter testified that appellant is a respected and feared member of CVL, and many of the younger CVL members "attribute the … gang to him." Yetter explained, "the repercussions for [i]mpersonating [appellant] are—I don't even think it's really in the realm of feasibility." Further, a P.S. on the side of the kite stated, "Call Leli," and "tell her you have stuff for her." The phone number written next to the P.S. on the note was associated with Orelia Corona, a frequent jail visitor and recipient of phone calls from appellant.

The kite was addressed to "Baby Paya." Yetter explained that Baby Paya is a very specific moniker used by Santos Tapia, a member of CVL. In the kite, the author wrote that Tapia would have to step up and "becom[e] 'me' " (referring to the author) in terms of gang leadership. The kite went on to state: "Look son[,] baby [crossed out] lives at this two-story pad on [cross streets]!!!!" Yetter said the significance of "baby" being crossed out meant he was a rival or someone the author wanted killed or both. Yetter also testified that Zapata Jr. lives right on the corner of the cross streets the author referred to and that his residence is a single story but appears to be two stories from the street.

8.

The kite continued: "Need you to go thru with cholo & peep it out…. That puto is strapped up, so when its confirmed & he's there I need him dusted off already." The prosecutor asked Yetter if this was "consistent" with what he heard during the wire intercept, and Yetter responded, "Yeah. I mean, all of it was the location. The kite exactly matched up with what we had heard on the wire. And upon seeing the kite the two kind of fit together."

The kite further stated: "It took me '3' days to get them putos why is it tak[ing] so long for anyone to HELP me? … I've let to do & go out there for our fallen perrito Lil Paya CIP … without a second guess cuz it's what I've always done." Yetter explained that "Lil Paya" was a moniker for Angel Vasquez, a Calwa gang member who was killed in August 2013. The author continued: "Also I ain't worth a killing to hunt & kill Baby [crossed out] … I did not finish off my kill & now I'm stuck, its how it goes in the kill game, get sloppy, don't finish job correctly."

It was revealed at trial that Vasquez's birthday was December 28. On the day of his death, he had gotten into an argument with Zapata Jr. Law enforcement believed Zapata Jr. may have possibly been involved in the homicide of Vasquez, but another individual was arrested. Photographs taken on December 28, 2013, showed appellant with two other Calwa gang members in front of a sign that said, "Happy 27th birthday Lil Brother" and "RIP Angel."

Appellant's cell phone was found when the police searched the converted garage. The phone contained a photograph of appellant holding a silver semiautomatic handgun that was sent in a text message on January 1, 2014. Other text messages sent by appellant before the shooting on January 1, 2014, stated: "J locs and Big Paya … standing strong [for that] C side turf …" and "[B]oys posted and waiting on Dem sabes … C luv, you always my loyalty." Yetter testified that "C side turf" refers to Calwa.

FBI forensic document examiner Gabriel Watts testified he performed a handwriting analysis on the kite. Watts explained the FBI has five possible conclusions

9.

resulting from a given handwriting analysis: identification, elimination, "may have," "may not have," and "straight no conclusion." Watts testified that "may have" means the examiner was "leaning toward an identification" but there was some limitation that prevented them from identifying. As for the kite, Watts testified appellant "may have" prepared it. Watts testified he could not conclusively identify appellant due to "overwriting, some characteristics not observed in the known writing[,] and limited comparability." Watts said the results were not inconclusive, and appellant could not be excluded as the writer.

Appellant presented no evidence in his defense. Defense counsel argued there was insufficient evidence to prove that appellant was the shooter, noting the screen door obscured the actual shooting. Defense counsel pointed out there was no ballistics evidence regarding the weapon or that it matched the firearm in appellant's possession.

## DISCUSSION

### I. Admission of Wiretap Statements Through Yetter's Testimony

#### A. *Relevant Background*

The prosecution sought to admit Yetter's testimony about the wire intercepts to show "consciousness of guilt, as well as further evidence on the gang aspect of the case." Defense counsel requested an Evidence Code section 402 hearing, objecting to the authenticity of the wiretap contents. Following the hearing, defense counsel objected to the admission on the grounds of relevance and hearsay. The trial court in turn asked the prosecutor what tied the wiretap conversations to appellant, stating "certainly, this might be material and relevant, but [the] prejudicial effect is just as high." The prosecutor requested that the court reserve ruling on the admissibility of the wiretap statements until the court heard evidence on the kite, explaining the relevance would be made clear in conjunction with the kite. The court did not make a ruling as to the admissibility of the contents of the wiretap statements.

10.

Following an Evidence Code section 402 hearing on the admissibility of the kite, the court ruled the kite admissible. Defense counsel did not request a ruling on the wiretap evidence, and the court made no such ruling. When Yetter testified to the wiretap contents, defense counsel did not object.

### B.      The Parties' Contentions

Appellant contends that Yetter's testimony of the contents of the wiretap conversations constituted inadmissible case-specific out-of-court-statements in violation of *Sanchez*, *supra*, 63 Cal.4th at page 674. In *Sanchez*, the California Supreme Court held: "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay" and inadmissible unless they fall under an exception. (*Id*. at pp. 674, 686.) The *Sanchez* court also held: "If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Id*. at p. 686.)[5]

Respondent argues the issue was forfeited because appellant failed to renew his objection to the admission of the contents of the wiretap evidence during trial. In the event we do not find forfeiture, respondent argues the contents of the wiretaps were not inadmissible because, though they were hearsay, they fell under the "co-conspirator" hearsay exception in Evidence Code section 1223.[6] In the event we find the statements improperly admitted, respondent contends the error was harmless.

[5]      Appellant does not contend the admission of the statements constituted a confrontation clause violation.

[6]      Evidence Code section 1223 provides: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: [¶] (a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy; [¶] (b) The statement was made prior to or during the time that the party was participating in that conspiracy; and [¶] (c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the

## C. Analysis

We decline to decide the issue based on forfeiture and need not decide whether the evidence was admissible under an exception to the hearsay rule because, in any event, any alleged error was harmless.

The parties agree the proper harmless error standard for us to apply is the reasonable probability standard described in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).[7] (See *Sanchez*, *supra*, 63 Cal.4th at pp. 685, 698.) Pursuant to this standard, reversal is required only if it is reasonably probable that the defendant would have achieved a more favorable result if not for the error. (*People v. Wall* (2017) 3 Cal.5th 1048, 1060.)[8]

Appellant argues the admission of the wiretap statements was prejudicial because his identity as the shooter was the "sole issue" at trial, and that the "powerful motive" evidence contained in the wiretap statements improperly "buttressed" the prosecution's case he was the shooter to prejudicial effect. We disagree and conclude there is not a reasonable probability the admission of the wiretap statements through Yetter's testimony had any impact on the jury's verdict, particularly with regard to whether appellant was the shooter.

The basic facts established by the wire intercepts were that "Peanut" and "Black" were discussing killing Zapata Jr., or having him killed, on behalf of appellant in 2016,

---

facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

[7] Appellant argues the contents of the wiretap was inadmissible under state law but makes no claim of a confrontation clause violation or any other constitutional claims.

[8] We note that in describing the *Watson* standard in his briefing, appellant notes "the question is whether absent the error a single juror could reasonably have reached a different result," citing this court's decision in *People v. Soojian* (2010) 190 Cal.App.4th 491, 521. The standard is not whether a juror *could* reach a different conclusion, but if it is *probable* a juror could have reached a different conclusion. (*Ibid.*)

over two years after the shooting. They also discussed appellant being disappointed if they did not do so. Another call indicated appellant appeared to approve of this plan. This was not, however, the only evidence of appellant's desire to have Zapata Jr. killed in 2016; the stronger evidence consisted of appellant's own statements in the kite.[9] Appellant crossed out Zapata Jr.'s moniker, which Yetter explained showed that Zapata Jr. was an enemy or that the writer of the kite wanted him killed or both. This read in conjunction with appellant's statement that he wanted Zapata Jr. "dusted off" along with the cross streets where he lived, as well as other statements in the kite, tend to show it was the latter. In any event, though the evidence of the wiretap statements tended to prove a plan to kill Zapata Jr. in 2016 was possibly being carried out, this fact considered in the context of the totality of the evidence against appellant, had little to no probative value to the issue of appellant's guilt for the 2014 crimes.

Appellant frames the facts regarding the CVL's plan to kill Zapata Jr. in 2016 as "motive" evidence tending to support that appellant committed the charged crimes, but the more compelling "motive" evidence was the totality of: (1) the evidence presented that Zapata Jr. was thought to have some involvement in Vasquez's death; (2) the references made to Vasquez in the kite; (3) the photographs of appellant celebrating Vasquez's birthday on December 28, 2013; and (4) his comment in the kite that it took him " '3' days to get them putos." None of this was reliant on the wiretap statements.

---

[9] We note that appellant does not challenge the admissibility of the kite on appeal. Appellant does, however, attempt to undermine the kite's evidentiary value and demonstrate the prejudicial effect of the admission of the wiretap statements by arguing that authorship of the kite was "much disputed" and the wiretap evidence "reinforced [the] fact that [appellant] wrote the kite." But the evidence that appellant wrote the kite was strong and not reliant on the wiretap statements. Yetter's testimony the kite was written by appellant was strong evidence particularly based on Yetter's experience investigating gangs and being a member of MAGEC. The prosecutor's handwriting expert's testimony that appellant "may have" written the kite did not weaken Yetter's testimony as appellant seems to suggest, but strengthened it. Based on this evidence, it would have been unreasonable to conclude appellant did not write the kite.

More importantly, "motive" was not the only evidence pointing to appellant's guilt. Appellant said in the kite he did not "finish off my kill"; this, when read in the context of the entire kite, indicated he was the perpetrator of the 2014 shooting. Moreover, Rodriguez identified appellant as the shooter to Villalvazo just a couple of days after the shooting. Though she denied doing so in her testimony, her statement to Villalvazo was strengthened and her testimony weakened by the surveillance video.

The prosecutor relied strongly on the surveillance video in proving appellant was the perpetrator. Among many references to the evidentiary strength of the video, the prosecutor made the following comments in her closing argument:

> "Take away the kite. Take away … Rodriguez. And you're still left with the one eye-witness that I have repeatedly referenced as not being able to make up, forget, be intimidated. And I'll show you the video of [the surveillance footage]. [¶] This is the video. The door opens. Pay attention. We may not be able to see through the door. You may not be able to see the actual shooting take place. However, by process of elimination you can determine who was already out and who came out after, and by inference, who the shooter was."

The prosecutor explained step by step as the video played why the only person who could be responsible for the shooting was appellant based on the video and one of the responding officer's testimony that no one was present in the residence when they arrived: "So everyone is present and accounted for as coming out of that garage. And only one of those people went towards the … [victims]. Only one of those individuals ran after [Rodriguez] with a gun in his hand. Only one of those individuals is caught tucking that gun into his pants."

At appellant's sentencing, the trial court echoed the prosecutor's comments regarding the ability of the jurors themselves to be able to determine that appellant was the shooter. The court stated: "The only reason that justice in this case was conducted beyond that of the prosecution's bringing the court's attention to this matter is that modern technology kicked in. Something, as [the prosecutor] said at the beginning of her

14.

opening statement, that doesn't have a bias. Isn't frightened. Isn't threatened. It's the cold, hard truth of a surveillance camera that when you piece together leaves the only person culpable as [appellant] clear as day. Clear as day."

Finally, the relatively short period of time the jury deliberated indicated it was not a close case. The jury was taken to the jury room to begin deliberations at 1:50 p.m. They stood in recess from 3:10 to 3:18 p.m. At 3:44 p.m., the jury advised the court it had reached a verdict. Thus, after approximately five days of testimony and over 100 exhibits, the jury only deliberated for approximately an hour and 45 minutes. (See, e.g., *People v. Cardenas* (1982) 31 Cal.3d 897, 907 [six hours of deliberations is evidence of a close case].) The record does not reflect that the jurors requested a read back of any testimony or asked any questions. (See *People v. Pearch* (1991) 229 Cal.App.3d 1282, 1295 ["Juror questions and requests to have testimony reread are indications the deliberations were close."].) The jurors signaled they were sure about their verdict.

We disagree with appellant's characterization of the prosecutor's reliance on the wire intercepts as motive and therefore identity evidence and its importance to the prosecution's case. The prosecutor only briefly mentioned the wire intercepts in her closing argument, and she does so in the context of whether the attempted murder of Zapata Jr. was committed for the benefit of a criminal street gang, not in the context of whether appellant committed the crimes. Thus, if the jury put any relevance onto the wiretap statements, we believe, based on the prosecutor's theory, it would be in reference to the gang allegations, rather than appellant's identity as the perpetrator.[10] Appellant does not claim in his briefing that the alleged error had any effect on the jury's determination of the murder special circumstance or any gang allegation.

---

[10]     Nor would any claim succeed on its merits, as there was ample, more compelling evidence that appellant was an active participant in a criminal street gang and the crime was committed to further the activities of the gang within the meaning of section 190.2, subdivision (a)(22).

15.

Appellant contends the prejudicial impact of the admission of the statements "should not really be in dispute" because the trial court commented that the wiretap evidence had prejudicial effect when determining its admissibility during motions in limine. We are not bound by these statements as appellant seems to suggest. The balancing of probative value against undue prejudice a trial court must do when determining admissibility of evidence is not the same as the prejudice analysis reviewing courts do under *Watson*. The latter analysis depends on viewing the alleged erroneously admitted evidence in the context of the totality of the evidence and other circumstances of the trial. The trial court was not in a position to do so at the time it made the comment cited by appellant because evidence had not even been presented at that stage.

We conclude it is not reasonably probable the exclusion of the wiretap statements would have changed a juror's mind regarding whether appellant was the perpetrator in light of the other strong evidence of his guilt and the way the prosecutor used the wiretap evidence in her closing. For the forgoing reasons, we conclude that any error in admitting the statements from Yetter's wiretap investigation was harmless. Accordingly, reversal is not necessary.

## II. Alleged State Interference with Appellant's Right to Effective Assistance of Counsel

The jury was instructed with CALCRIM No. 315, entitled "Eyewitness Identification." The instruction read:

"You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony.

"In evaluating identification testimony, consider the following questions:

"● Did the witness know or have contact with the defendant before the event?

"● How well could the witness see the perpetrator?

16.

"● What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation?

"● How closely was the witness paying attention?

"● Was the witness under stress when he or she made the observation?

"● Did the witness give a description and how does that description compare to the defendant?

"● How much time passed between the event and the time when the witness identified the defendant?

"● Was the witness asked to pick the perpetrator out of a group?

"● Did the witness ever fail to identify the defendant?

"● Did the witness ever change his or her mind about the identification?

"● How certain was the witness when he or she made an identification?

"● Are the witness and the defendant of different races?

"● Was the witness able to identify the defendant in a photographic or physical lineup?

"● Were there any other circumstances affecting the witness's ability to make an accurate identification?

"The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty."

Appellant argues that the court instructing the jury with this instruction, particularly with the sentence, "You have heard eyewitness testimony identifying the defendant," amounted to state interference with appellant's Sixth Amendment right to effective assistance of counsel. Appellant contends the instruction was improper because

17.

Rodriguez, the eyewitness, did not identify appellant in her testimony but instead insisted she did not see the shooter's face. Appellant contends his trial counsel was precluded from cross-examining Rodriguez on factors in the instruction such as how the description of the defendant compares to the defendant and how certain the witness was when she made the identification. Appellant asserts the error requires no showing of prejudice.

Appellant relies primarily on three United States Supreme Court cases where the Supreme Court found violations of the defendant's right to effective assistance of counsel due to state interference to support his claim: *Geders v. United States* (1976) 425 U.S. 80; *Herring v. New York* (1975) 422 U.S. 853; and *Brooks v. Tennessee* (1972) 406 U.S. 605. In *Geders*, the trial court forbade the defendant from consulting with his attorney overnight while the defendant was testifying on his own behalf. (*Geders v. United States*, at pp. 82–84.) The Supreme Court reversed, noting the sequestration order impeded on counsel and the defendant's opportunity to discuss the events of the day's trial. (*Id.* at pp. 88, 91.) In *Herring*, the trial court did not allow the defendant's attorney to make a closing argument pursuant to state statute. (*Herring v. New York*, at p. 856.) The United States Supreme Court noted "[t]here can be no doubt that closing argument for the defense is a basic element of the adversary factfinding process in a criminal trial." (*Id.* at p. 858.) In *Brooks*, the trial court denied defense counsel's motion to allow the defendant to testify after other defense witnesses had testified. (*Brooks v. Tennessee*, at p. 606.) The Supreme Court found this violated the defendant's rights to due process and against self-incrimination. (*Id.* at pp. 612–613.) As we explain, appellant has not persuaded us the alleged error rose to the level of violation found in these cases. We find no violation of any of appellant's constitutional rights.

Here, as there was an eyewitness identification, defense counsel had every motivation to discredit Rodriguez's statement to Villalvazo. The court instructing with CALCRIM No. 315 did not change this. Defense counsel did in fact appropriately attempt to discredit the statement. While cross-examining Villalvazo, defense counsel

18.

pressed Villalvazo for more detail regarding how Rodriguez knew appellant. Defense counsel asked Villalvazo if he showed Rodriguez the surveillance footage; Villalvazo pinpointed for the jury the portion of the video from which Rodriguez made her identification. Defense counsel asked Villalvazo if he had ever shown Rodriguez the report he prepared regarding her statement, to which Villalvazo responded that he had not. Defense counsel asked Villalvazo how long the interview lasted and whether Villalvazo was the only detective present in the interview room. These areas of questioning related to the confidence level of Rodriguez's identification, as well as the accuracy of Villalvazo's testimony.

Further, defense counsel elicited testimony from Rodriguez that appellant was *not* the shooter. Defense counsel highlighted Rodriguez's testimony during his closing argument, noting that her statement under trial was under oath and that relying on Villalvazo's testimony would require the jury to rely on his "notes" and "memory" of what she told him while not under oath.

Appellant's state-affected ineffective assistance of counsel claim is also weakened by the fact that the instruction was properly given.[11] Villalvazo testified that Rodriguez was an eyewitness who identified appellant. Thus, the factors listed in CALCRIM No. 315 were relevant to the jury's consideration of Villalvazo's testimony as to identification. Appellant's claim that the instruction "transform[ed]" Villalvazo's testimony into eyewitness testimony identifying appellant is not well taken. It is not reasonably likely the jury would have taken this instruction to give Villalvazo's testimony weight as an "eyewitness." The jury was instructed that words and phrases not specifically defined in the instructions "are to be applied using their ordinary, everyday meanings." (CALCRIM No. 200.) "Eyewitness" is defined as "[a] person who has

---

[11]    Appellant acknowledges he did not object to the court's giving of this instruction below and briefly alleges his attorney's failure to object constituted ineffective assistance of counsel. Because we find the instruction was properly given, this claim fails as well.

19.

personally seen something happen and so can give a first-hand description of it."[12] We presume jurors follow the court's instructions. (*People v. Holt* (1997) 15 Cal.4th 619, 662.) The only reasonable way for the jury to apply CALCRIM No. 315 was to apply it to the identification taken from Rodriguez's statement as testified to by Villalvazo, which was necessary for their consideration of all the facts.

There was no state interference with appellant's right to effective assistance of counsel, and the court did not err by giving the instruction.

## III. Senate Bill Nos. 620 and 1393

Appellant contends we must remand his case to the trial court in light of two laws that became effective after his initial sentencing but before his case became final. Senate Bill Nos. 620 and 1393 both give trial courts discretion they previously did not have to impose more lenient sentences. Senate Bill No. 620, which went into effect January 1, 2018, in part, amended section 12022.53 (Stats. 2017, ch. 682, § 2) to allow the trial judge to strike or dismiss enhancements imposed pursuant to section 12022.53, subdivision (d). At the time appellant was sentenced, section 12022.53, subdivision (d) mandated a consecutive enhancement of 25 years to life. Similarly, Senate Bill No. 1393, which went into effect January 1, 2019, amended sections 667 and 1385 (Stats. 2018, ch. 1013, §§ 1, 2) to eliminate the statutory prohibition on a trial court's ability to strike a five-year enhancement imposed pursuant to section 667, subdivision (a)(1).

The parties agree, as do we, that the amendments implemented by Senate Bill Nos. 620 and 1393 apply retroactively to cases not yet final on appeal; the parties disagree, however, on whether remand is appropriate in this case. (*People v. Brown* (2012) 54 Cal.4th 314, 323–324; *People v. Francis* (1969) 71 Cal.2d 66, 75–76; *In re*

---

[12] Lexico.com Dictionary, https://www.lexico.com/en/definition/eyewitness (last visited Sept. 4, 2020).

*Estrada* (1965) 63 Cal.2d 740, 745.) We conclude remand is not necessary in the present case.

Generally, remand is necessary when the record shows the trial court proceeded with sentencing on the erroneous assumption it lacked sentencing discretion. (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.) However, if the record shows the sentencing court " ' "would not have exercised its discretion even if it believed it could do so, then remand would be an idle act and is not required." ' " (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425; *People v. Jones* (2019) 32 Cal.App.5th 267, 272.)

Here, the court made the following comment at sentencing: "I was not going to say anything because this sentence is something that the Court has absolutely no discretion in making any differences. And even if I did, I would not." The court went on to outline the reasons it would not exercise any discretion in the case: appellant's lengthy criminal record, including residential burglaries as a juvenile; armed robbery; possession of firearms as a felon as an adult; and parole violations. The court continued: "The facts of this case are atrocious." The court then addressed appellant: "[Y]ou have been given chance after chance after chance. This is not a second chance case." The court told appellant he would spend the rest of his natural life in prison, and

> "[Prison is] not freedom … [prison is] not joy. You had the smarts to be something a lot better than what you were in life…. And that's a shame because you wasted your talents. Cause you don't have the right to take someone else's life, period. And you chose to. And at the same time you're loved ones are still here, which is a remarkable observation that you are still loved by many. But that is not something that I can factor into the sentence in this case…. [¶] … You've le[d] a long life of crime and, unfortunately, you've now taken a life given your extreme recklessness. You are deserving of the punishment as available in this case."

The court expressly indicated it would not exercise discretion even if it had it and moreover that appellant was deserving of the punishment "as available," which we interpret to mean the maximum sentence.

Appellant points to the following sentencing choices to argue the court tended toward "leniency": the fact that the court ordered appellant's sentence for count 3 to run concurrently with count 1; stayed the great bodily injury enhancement for count 2; and struck the section 667.5, subdivision (b) enhancements. We note that, pursuant to the probation report, which the court expressly followed, the section 667.5, subdivision (b) prison priors were stricken because they arose from the same case as the prior serious felonies pursuant to section 667, subdivision (a)(1). Probation recommended the sentence for count 3 should run concurrently because the crimes were "committed so close in time and place as to indicate a single period of aberrant behavior." We note the court imposed the upper term for count 3. We do not find the reasoning behind these sentencing choices to be indicative of the court's desire to be lenient. Neither the court nor the probation report indicated why the section 12022.7 enhancement was stayed; however, in light of the court's comments, we do not find the court's staying of the three-year great bodily injury enhancement is an indication it would have struck any firearm or prior serious felony enhancement.

Appellant contends his case is like *People v. Billingsley* (2018) 22 Cal.App.5th 1076. There, the appellate court remanded for resentencing despite the trial court's refusal to run the enhanced sentence concurrently and made the following comments: " '[T]his is not the kind of case I would stay the gun allegation. I have no say as to the actual penalty for that particular allegation. It's set at 20 years, but as far as staying or striking the allegation, the court does not have authority to do so, nor would it do so under the circumstances of this case.' " (*Id*. at p. 1080.)

*Billingsley* is inapposite. There, the appellate court noted the trial court thought the case " 'could have been a lot worse,' … [it] did not express an intention to impose the maximum possible sentence [and] also expressed concern the consequences for Billingsley's sentence were 'unfortunate' and 'tragic.' " (*People v. Billingsley*, *supra*, 22 Cal.App.5th at p. 1081.) Here, in contrast, though the court observed the presence of

22.

appellant's family members, and noted appellant was loved, it did not express sympathy for appellant. Rather, we interpret the court's comments as expressing surprise there were so many people supporting appellant in light of his actions. The court too commented the facts of the case were "atrocious" and that appellant was "deserving" of the multiple life sentences imposed.

We conclude remand for resentencing for the court to determine whether or not to exercise its discretion pursuant to the amendments made by Senate Bill Nos. 620 and 1393 would be an idle act and accordingly decline to do so.

## DISPOSITION

The judgment is affirmed.


                                                            DE SANTOS, J.

WE CONCUR:


POOCHIGIAN, Acting P.J.


PEÑA, J.

23.